THE CITY OF WOOSTER, APPELLEE, *v.* GRAINES, TRUSTEE, APPELLANT.

[Cite as Wooster *v.* Graines (1990), 52 Ohio St. 3d 180.]

(No. 89-403—Submitted March 6, 1990—Decided July 3, 1990.)

*H. Lloyd Cornelius,* director of law, for appellee.

*Paul M. Greenberger* and *Ellen S. Mandell,* for appellant.

HOLMES, J. It is beyond dispute that Section 4, Article XVIII of the Ohio Constitution authorizes a municipality to own and operate a utility.[1] Therefore, Wooster, as a municipality, had the authority to establish and maintain the sewer utility as long as the rates to be charged and the revenue collected therefrom complied with the mandates of R.C. 729.49 and 729.52.

R.C. 729.49 provides in pertinent part:

"The legislative authority of a municipal corporation which has installed or is installing sewerage, a system of sewerage, sewage pumping works, or sewage treatment or disposal works for public use, may, by ordinance, establish just and equitable rates or charges of rents to be paid to the municipal corporation for the *use* of such services, by every person, firm, or corporation whose premises are served by a connection thereto. * * *" (Emphasis added.)

R.C. 729.52 provides in pertinent part:

"The funds received from the collection of sewer rentals under section 729.49 of the Revised Code shall be deposited weekly with the treasurer of the municipal corporation. Money so deposited shall be kept as a separate and distinct fund and shall be known as the sewer fund. * * * [Such] fund shall be used for the payment of the cost of the management, maintenance, operation, and repair of the sewerage system and sewage pumping, treatment, and disposal works. Any surplus in such fund may be used for the enlargement or replacement of the system and works, for construction and reconstruction of main and interceptor storm sewers, for the payment of the interest on any debt incurred for the construction thereof, and for the creation of a sinking fund for the payment of such debt, but shall not be used for the extension of a sewerage system to serve unsewered areas or for any other purpose * * *."

In his second, third and fifth propositions of law, appellant claims that the large amount of surplus in the fund demonstrates that the sewer rates are unjust and inequitable in violation of R.C. 729.49 because the charges exceed what is needed for the *use* of such services. He further argues that the surplus is being used for purposes other than those contemplated in R.C. 729.52, and that resultantly such

---

[1] Section 4, Article XVIII provides:

"Any municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the product or service of which is or is to be supplied to the municipality or its inhabitants, and may contract with others for any such product or service. The acquisition of any such public utility may be by condemnation or otherwise, and a municipality may acquire thereby the use of, or full title to, the property and franchise of any company or person supplying to the municipality or its inhabitants the service or product of any such utility."

surplus funds derived from the sewer fees amount to an illegal tax.

Appellant argued before the lower courts, and again here, that the law announced by this court in the case of *Cincinnati* v. *Roettinger* (1922), 105 Ohio St. 145, 153-154, 137 N.E. 6, 8, should apply. The *Roettinger* court stated:

"* * * While it is universally conceded that rates and charges not in excess of the amount necessary to meet such purposes are not classed as taxes, it does not follow that such excessive amount would not be classed as taxes. While it is quite well settled that charges for service and conveniences rendered and furnished by a municipality to its inhabitants are not taxes, yet where the charge is in excess of the entire cost of the service and convenience, the reason for the rule no longer prevails. * * *"

In response, Wooster has asserted throughout these proceedings that it has complied with R.C. 729.49 and 729.52 because the sewer funds are segregated from other funds, the funds are for the exclusive use of the sewer utility and the excess revenues are being held for future sewer projects within the city. As previously noted, a "prioritized list" of these future projects was compiled after several engineering studies and Wooster estimated that the total cost for these projects would exceed $13 million. Upon these points, the trial court stated in its conclusions of law in its judgment entry:

"* * * As established by the testimony of city administrators, the storm sewer fund is segregated from all other funds and is used to collect cash to pay for capital expenditures related to sewer projects. This procedure is codified in Sec. 6.06 of the Charter of the City of Wooster. The funds accumulated would then be spent on the prioritized sewer projects. There is absolutely no evidence that any funds would be diverted for general governmental expenses. And, in light of the prioritized list of sewer fund projects, as well as their estimated cost, the Court cannot say that the rate established by WOOSTER is unreasonable or unrelated to GRAINES' use of the system."

Upon this issue we are in agreement with the lower courts. As stated, municipalities in Ohio do have the authority pursuant to Section 4, Article XVIII of the Ohio Constitution to own and operate a utility. The trial court here determined that Wooster was empowered to "establish and maintain a public utility and charge the public for sewer services provided, provided that the rates are just and equitable."

The trial court found that there was "no question that storm sewer services have been provided to GRAINES's property and that the amount due and owing for the services is accurately reflected in the complaint. * * *" It further found that Ordinance No. 1985-34 "was passed under a valid exercise of the powers granted to Wooster City Council. * * *"

On the question of retained earnings the trial court cited *Cincinnati* v. *Roettinger, supra.* In that case, this court held in paragraph one of the syllabus as follows:

"* * * [S]urplus revenues derived from water rents may be applied only to repairs, enlargement or extension of the works, or of the reservoirs, and to the payment of the interest of any loan made for their construction, or for the creation of a sinking fund for the liquidation of the debt."

The trial court found in the instant case it was not faced with the issue of

transfer of surplus funds, and *Roettinger* appeared to "sanction the practice of accumulating surplus funds so long as those funds are maintained in a segregated account and expended for a project related to the account.* * *" To support its position the trial court cited the following language from *Roettinger:*

"* * * That is to say, they [the authorities controlling the fund] 'may' either *do nothing whatever with the surplus,* which would automatically and necessarily operate to bring about a reduction of rates and charges, or maintain the rate and apply the surplus thus produced to extensions, new construction, or interest and principal of debts." *Id.* at 151, 137 N.E. at 8.

This court has held as syllabus law in *State, ex rel. Gordon,* v. *Rhodes* (1952), 158 Ohio St. 129, 48 O.O. 64, 107 N.E. 2d 206, that:

"Where fees charged by a municipality for the parking of motor vehicles on and off the streets are not unreasonable in amount or designed to bring to the municipality revenue other than sufficient to cover the cost and expense of providing necessary parking facilities for such motor vehicles on and off the streets of the municipality, the charging and collection of such fees will not represent the levy of a tax." *Id.* at paragraph two of the syllabus.

From a study of the above cases it is clear that retained earnings in the storm drainage enterprise fund are proper as long as they are not diverted to purposes other than those authorized in Chapter 925 of the Wooster Codified Ordinances, relating to storm drainage. There has been no evidence introduced which even suggests an attempt on the part of Wooster City Council to divert any of these funds to any purpose other than it has provided for in Chapter 925 of the Wooster Co-

dified Ordinances. In Section 925.03 (c), the council has provided:

"Such [storm drainage] charges shall be paid monthly by those liable therefor and placed in a Storm Drainage Fund into which *all of such charges so collected shall be deposited and kept as a fund to be used only for the purposes stated herein.*" (Emphasis added.)

In *Himebaugh* v. *Canton* (1945), 145 Ohio St. 237, 39 O.O. 348, 86 N.E. 2d 614, this court held in paragraph one of the syllabus as follows:

"Water rates or charges or 'rents' collected by a municipality cannot be classed as taxes so long as their use is limited to the waterworks purposes enumerated in Section 3939, General Code; but if employed as a mere device to lessen the burden of taxation for general governmental purposes, such funds should be considered in the category of taxes."

The trial court here, in reviewing all of the materials before it upon the motions for summary judgment, determined that Wooster "has established a prioritized list of storm sewer projects to improve storm drainage in its corporate boundaries. * * * Wooster and its engineers estimated that the total cost of these projects would exceed $13 million. Eric Oswald, Wooster City Engineer, testified that construction of all of the projects identified on the prioritized list would take a number of years.* * *"

The trial court further determined the evidence before it showed that the sewer rates established by Wooster City Council are based upon 3,050 square feet of impervious surface being a "unit of service," and that this unit of service is applied uniformly to all improved properties in the city of Wooster.

The trial court found as a fact that "Oswald also testified that the parking

lot on Graines' property (College Hills Shopping Center) contains a number of catch basins for storm water and that according to plans in the Engineering Office, the catch basins drain into the city's storm sewers. This particular storm sewer discharges into a natural stream, and this, in turn, flows into the Little Apple Creek, all of which are an integral part of the storm drainage system of the City of Wooster."

Also, the court found that "storm sewer services have been provided to Graines's property and that the amount due and owing for the services is accurately reflected in the complaint. * * *" Further conclusions of law of the trial court were that "[a]s established by the testimony of city administrators, the storm sewer fund is segregated from all other funds and is used to collect cash to pay for capital expenditures related to sewer projects. This procedure is codified in Sec. 6.06 of the Charter of the City of Wooster. The funds accumulated would then be spent on the prioritized sewer projects. There is absolutely no evidence that any funds would be diverted for general governmental expenses. And, in light of the prioritized list of sewer fund projects, as well as their estimated cost, the Court cannot say that the rate established by WOOSTER is unreasonable or unrelated to GRAINES' use of the system."

Further, in his first proposition of law, the appellant argues, as he did below, that the expenditure of the retained sewer charges for the prioritized sewer projects are outside the allowable parameters of R.C. 729.52. In particular, the appellant argues that the prioritized sewer projects are an extension of the Wooster sewer system contrary to such section of law.

In holding that the prioritized sewer projects did not violate R.C. 729.52, the trial court found that "[i]t is clear from the evidence adduced at the October 16th hearing that the storm drainage system as it existed at the time of the enactment of Chapter 925 [of the Wooster Codified Ordinances] included all of the drainage within the corporate boundaries of the City of Wooster. From time to time, the existing system may need improvements, such as laying pipe in previously opened drainage ways or ditches. This does not constitute extending sewer lines to unsewered areas. * * *"

The court of appeals, in agreeing with the trial court that R.C. 729.52 had not been violated here, stated that "* * * the Wooster Storm Sewer System currently encompasses the entire geographic boundaries of Wooster and consists of both man-made and natural drainage systems. Thus, we find that the prioritized sewer fund projects do not amount to an extension of the Wooster storm drainage system. *Mead-Richer* v. *Toledo* (1961), 114 Ohio App. 369."

We also agree with the trial court and the court of appeals upon this issue. The prioritized sewer projects for which accumulated funds are earmarked do not amount to an illegal extension of the city's sewer system. As noted by the court of appeals, the city's sewer system currently encompasses the entire geographic boundaries of Wooster and includes both man-made and natural drainage systems. All of the city's prioritized projects are within this boundary.

Summary judgment is appropriate where the movant demonstrates: (1) there is no genuine issue as to material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can reach but one conclusion, and that conclusion is adverse to the party against whom the motion is made, who is entitled to have

the evidence construed most strongly in its favor. *Tucker* v. *Webb Corp.* (1983), 4 Ohio St. 3d 121, 4 OBR 367, 447 N.E. 2d 100; *Harless* v. *Willis Day Warehousing Co.* (1978), 54 Ohio St. 2d 64, 8 O.O. 3d 73, 375 N.E. 2d 46. The trial court reviewed the evidentiary materials properly before it, as well as the transcript of the October 16, 1987 hearing and the applicable law, and found that there was no genuine issue as to material fact, and that Wooster was entitled to judgment as a matter of law. The court then overruled the appellant's motion for summary judgment. We concur in that court's conclusions.

In his fourth proposition of law, appellant for the first time raises the question of whether the sewer rates charged by Wooster and the resulting surplus constitute the taking of property without due process of law.

We will not " 'consider a claim of error that was not raised in any way in the Court of Appeals and was not considered or decided by that court[,]' " even if the error alleged is constitutional. *State* v. *Abrams* (1974), 39 Ohio St. 2d 53, 55, 68 O.O. 2d 30, 31, 313 N.E. 2d 823, 825. See, also, *Toledo* v. *Reasonover* (1965), 5 Ohio St. 2d 22, 34 O.O. 2d 13, 213 N.E. 2d 179; *State* v. *Lisiewski* (1969), 20 Ohio St. 2d 20, 24, 49 O.O. 2d 147, 150, 252 N.E. 2d 168, 171; *State* v. *Phillips* (1971), 27 Ohio St. 2d 294, 302, 56 O.O. 2d 174, 178, 272 N.E. 2d 347, 352; *State* v. *Kuno* (1976), 46 Ohio St. 2d 203, 205, 75 O.O. 2d 239, 240, 346 N.E. 2d 768, 770.

Accordingly, the judgment of the court of appeals is hereby affirmed in all respects.

*Judgment affirmed.*

MOYER, C.J., WRIGHT, H. BROWN and RESNICK, JJ., concur.

GWIN and DOUGLAS, JJ., dissent.

˙ W. SCOTT GWIN, J., of the Fifth Appellate District, sitting for SWEENEY, J.

GWIN, J., dissenting. I must respectfully dissent. Because this case was disposed of by summary judgment, we must examine all the evidence presented in support of and in opposition to summary judgment in the light most favorable to appellant. Upon such review in this case, I find sufficient evidence to raise genuine issues of material fact whether the city of Wooster established its sewer rates for reasons other than those contemplated in R.C. 729.49 and 729.52, whether Wooster was using its surplus sewer funds in an impermissible manner, and whether such surplus funds derived from the sewer fees constituted an impermissible tax.

During a hearing on appellant's motion for a preliminary injunction and an evidentiary hearing, James B. Pyers, Wooster's Director of Finance, testified that one of the several reasons for maintaining a sewer fund surplus was "[t]o protect the City's financial position * * * and keep it in a strong * * * financial position. We want to establish a revenue and a utility fund. Once that history is established, we can immediately go out and borrow funds and be credible in the marketplace." When reviewing this testimony in the light most favorable to appellant, I believe that reasonable minds could conclude that Wooster may be using the surplus funds for purposes other than those listed in R.C. 729.52. For instance, further evidence may be adduced at trial to show that Wooster was using the surplus funds to create a more favorable financial statement thereby making its municipal bonds more attractive.

Additionally, when viewing the amount of the surplus in light of the director of finance's testimony, reasonable minds could also conclude that the sewer rates were unjust and inequitable because such rates may have been established for reasons other than the *use* of the storm drainage system in violation of R.C. 729.49.

Accordingly, and contrary to the majority's finding that "no evidence [was] introduced which even suggests an attempt on the part of Wooster City Council to divert any of these funds to any purpose other than it has provided for in Chapter 925 of the Wooster Codified Ordinances," there is some evidence that the sewer rates were established for reasons other than those contemplated in R.C. 729.49 and 729.52.

The majority also agreed with the trial court and the court of appeals that reasonable minds could only conclude that because the sewer rates were segregated and the surplus funds were "earmarked" through a "prioritized list" for future sewer projects, the surplus funds derived from the sewer fees do not amount to an impermissible tax. It must be noted that there is no legislative mandate requiring these future projects to be carried out.

In *Cincinnati* v. *Roettinger* (1922), 105 Ohio St. 145, 154, 137 N.E. 6, 8, this court stated:

"* * * It is apparent that any effort on the part of any municipality to deliberately impose rates and charges for a water supply, not for the purposes of covering the cost of furnishing and supplying the water, but for the purpose of making up a deficiency in the general expenses of the municipality, and which cannot be met within the limits of taxation otherwise provided, is to that extent an effort to levy taxes, and, to the same extent, an effort to evade the statutory and constitutional limitations upon that subject."

In light of the above-quoted testimony of the director of finance, and when viewing this testimony in the light most favorable to appellant, there is sufficient evidence which raises a genuine issue whether Wooster was using the excess sewer funds for purposes other than furnishing of the sewer service and, therefore, whether such surplus constituted an impermissible tax.

For the foregoing reasons, I believe this decision should be reversed and the cause remanded to the trial court for the adjudication of these issues.

DOUGLAS, J., concurs in the foregoing dissenting opinion.