ALUMINUM LINE PRODUCTS CO. Appellants,

v.

BRAD SMITH ROOFING CO., INC. Appellees.

[Cite as *Aluminum Line Products Co. v. Brad Smith Roofing Co., Inc.* (1996), 109 Ohio App.3d 246.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 68703.

Decided Feb. 12, 1996.

*William J. Day,* for appellants.

*Buckley King & Bluso, William E. Armstrong* and *Barbara L. Armstrong,* for appellees, James Bradley Smith & Brad Smith Roofing Co., Inc.

*Smith, Marshall & Weaver* and *Phillip J. Weaver,* Jr., for appellee ERA Corp.

HARPER, Judge.

Plaintiff-appellants, Aluminum Line Products, Inc. ("Aluminum") and West 160th Street Realty Company ("West Realty"), appeal from the summary judgments entered in favor of defendants-appellees, James Bradley Smith and ERA Corporation ("ERA"), by the Court of Common Pleas of Cuyahoga County. Appellants submit that genuine issues of material fact remain for litigation regarding their claims against Smith for negligent construction, breach of an oral contract, and fraudulent concealment, and against ERA for breach of warranty and fraudulent concealment under the theory of successor liability. A careful review of the record compels an affirmance of the trial court's rulings.

I

Aluminum leases the Sperry Building, located at 24460 Sperry Circle, Westlake, Ohio, from West Realty. On behalf of Aluminum and West Realty, Aluminum's president, Kenneth Wessel, sought a quotation from Smith in the spring of 1984 for the reroofing of the building.

Smith orally proposed a $75,713 quote to reroof the building, including both materials and installation. This proposal was premised on the use of the "Button-On Syenergy Single-Ply" or "BOSS" rubber roof system, which was manufactured and marketed by Syenergy Methods, Inc. ("SMI"). SMI's product literature described the BOSS system as the application of a rubber membrane to a flat roof by a series of "button and clamp" fasteners which served to snap the membrane on to the roof. Appellants were provided this literature prior to their decision to proceed with the installation of the system.

Wessel subsequently asked Smith to install the BOSS system on the Sperry Building. Aluminum paid Smith $70,000 on June 29, 1984, and thereafter the remaining balance of the quoted price. The installation of the BOSS system was complete by mid-July 1984.

The $75,713 purchase price included the cost of a written twelve-year warranty issued by SMI. A portion of the warranty reads as follows:

"SMI's obligations hereunder shall be limited to the repair of the System or installation of a new System by an authorized applicator, or at the option of SMI, the reimbursement of the original purchase price of this system, and there shall be no liability for damage to other components of the roof or of the building. In no event shall SMI be liable for any indirect or consequential damages of the Owner or any third party.

" * * *

"EXCEPT AS STATED, SMI MAKES NO WARRANTIES—EXPRESS OR IMPLIED—OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR OTHERWISE. This warranty constitutes the final, complete and exclusive agreement between the parties and shall apply to and bind the parties, their respective successors and assigns."

The roof of the Sperry Building began to leak almost immediately after the July 1984 installation, and Wessel informed Smith of the leakage sometime during July or August 1984. Smith and Joseph J. Vuono, a SMI representative, inspected the roof in the presence of Wessel shortly after receipt of his complaint.

The inspection revealed that a design or manufacturing defect of a component used in the BOSS system caused perforations in the rubber sheeting. Leaks occurred when it rained due to the expansion and contraction of the rubber sheeting with changes in temperature. Since SMI's twelve-year warranty covered the BOSS system, SMI had the option to either replace the roof, repair it, or reimburse Aluminum for the original purchase price.

Though Smith performed temporary repairs following the inspection, SMI retained him to perform extensive warranty work. Smith replaced the BOSS system with another SMI system, which used adhesives. The repair work commenced on August 13, 1984, and was completed by September 13, 1984. SMI, in turn, inspected and approved the replacement installation on October 16, 1984.

The replacement system, however, still resulted in leaking at Aluminum's premises during 1984, 1985, 1986, 1987 and 1988. Wessel continually complained about the leakage to Smith, and Smith continued to make repairs at SMI's direction. Aluminum never paid Smith for the repairs, since payment was made directly to Smith by SMI under the twelve-year warranty.

Notwithstanding Smith's repairs to the building's roof, and SMI's direction thereof, appellants decided to replace it. On June 9, 1989, the Beck Company ("Beck") submitted a written quotation to appellant in the amount of $94,752. Aluminum issued a purchase order on that date which contained the terms and conditions of its agreement with Beck.

Appellants filed their original complaint in the trial court on April 10, 1991, naming Brad Smith Roofing Co. ("Smith Roofing"), SMI, and ERA, SMI's alleged successor in interest, as defendants. An amended complaint was filed on April 29, 1993, in which Smith, individually, was named a defendant.

ERA, Smith and Smith Roofing filed motions for summary judgment in response to the complaint and amended complaints. The trial court granted summary judgment in favor of ERA and Smith on June 28, 1994, and partial summary judgment in favor of Smith Roofing on July 24, 1994. In a journal

entry dated February 28, 1995, the trial court amended its partial summary judgment in favor of Smith Roofing to be a complete grant of summary judgment.[1]

## II

Appellants appeal from the grant of summary judgment in favor of ERA and Smith only, assigning the following as error [2]:

"1. The court of common pleas erred in granting defendant James Bradley Smith's motion for summary judgment because plaintiffs-appellants filed the original complaint within four years of when the causes of action accrued.

"2. The court of common pleas erred in granting defendant ERA Corporation's motion for summary judgment because ERA Corporation of Minnesota is the successor corporation of Syenergy Methods, Inc. of Connecticut.

 The granting of summary judgment is appropriate only if there is no genuine issue of material fact, and reasonable minds can come to but one conclusion, which is adverse to the nonmoving party. *Toledo's Great E. Shoppers City, Inc. v. Abde's Black Angus Steak House No. III, Inc.* (1986), 24 Ohio St.3d 198, 201, 24 OBR 426, 428–429, 494 N.E.2d 1101, 1103–1104; Civ.R. 56(C). An order granting summary judgment will, therefore, be upheld only where the record discloses no genuine issue of material fact and the moving party is entitled to judgment as a matter of law when construing the evidence most strongly in favor of the non-moving party. *Wooster v. Graines* (1990), 52 Ohio St.3d 180, 184–185, 556 N.E.2d 1163, 1167–1168; *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46.

 Summary judgment is a procedural device which is used to terminate litigation and, therefore, must be awarded with caution with all doubts resolved in favor of the nonmoving party. *Osborne v. Lyles* (1992), 63 Ohio St.3d 326, 333, 587 N.E.2d 825, 831; see, also, *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 359, 604 N.E.2d 138, 140–141. However, it "forces the nonmoving party to produce evidence on any issue for which that party bears the production at trial." *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 111, 570 N.E.2d 1095, 1099, citing *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265.

---

1. The trial court also granted appellants' motion for default judgment against SMI on the same date in the amount of $94,752. The propriety of this ruling is not before this court.

2. See Appendix for a more detailed format of appellants' two assignments of error.

A

Appellants, in their first assignment of error, submit that a genuine issue of material fact exists with regard to when their cause of action for negligent construction arose under R.C. 2305.09(D). They maintain that the applicable four-year statute of limitations is triggered when a plaintiff discovers or should have discovered an injury related to a defendant's act or failure to act and the plaintiff is put on notice to investigate, or when the relationship between the parties is terminated for the relevant transaction, whichever occurs later. Appellants argue that since they terminated their relationship with Smith on February 17, 1988, the last date of his attempted roof repairs, their negligent construction claim was timely filed on April 10, 1991.

In *Point E. Condominium Owners' Assn., Inc. v. Cedar House Assoc. Co.* (1995), 104 Ohio App.3d 704, 663 N.E.2d 343, this court discussed the four-year statute of limitations which governs tort actions for damage to real property, R.C. 2305.09(D). We cited *Gardens of Bay Landing Condominiums v. Flair Builders, Inc.* (1994), 96 Ohio App.3d 353, 645 N.E.2d 82, which we found to summarize the applicable law:

"An action for the failure of a builder to perform in a workmanlike manner is a tort sounding in negligence and is governed by the four-year statute of limitations found in R.C. 2305.09. *Benson v. Dorger* (1972), 33 Ohio App.2d 110, 115, 62 O.O.2d 176, 179, 292 N.E.2d 919, 922. Unless damage is immediate, the cause of action does not accrue until actual injury occurs or damage ensues. *Velotta v. Leo Petronzio Landscaping, Inc.* (1982), 69 Ohio St.2d 376, 23 O.O.3d 346, 433 N.E.2d 147, paragraph two of the syllabus. The judiciary will determine when a cause of action arose for purposes of statutes of limitations unless the triggering event is defined by the legislature. *O'Stricker v. Jim Walter Corp.* (1983), 4 Ohio St.3d 84, 4 OBR 335, 447 N.E.2d 727, paragraph one of the syllabus." *Id.* at 358, 645 N.E.2d at 85.

In *Gardens of Bay Landing,* damage to concrete floors was discovered in 1985 and two identical instances were discovered in 1986. The condominium association hired engineers in 1990, who advised it that there were structural deficiencies in the framing, flooring, and foundation, and that the floors required replacement. The association filed its claim for negligent construction on May 9, 1991. *Id.* at 359, 645 N.E.2d at 86.

This court, in determining whether the trial court properly found the negligent construction claim barred by R.C. 2305.09(D), stated:

"[A]ppellant [association] discovered and replaced the defective underlayment in 1985. The same problem was experienced in two other buildings the following year. At that point, appellant should have known there was a widespread

problem with the underlayment. Appellant did not retain the engineers for nearly four years after the third instance of failure.

"Appellant knew it had been damaged after the third instance occurred on October 15, 1986. The four-year statute of limitations began to run at that point. Appellant did not file suit until May 9, 1991, and, therefore, suit was barred by the statute of limitations." *Id.* at 359, 645 N.E.2d at 86.

■ The *Velotta* holding is not a discovery rule, as construction cases deal with a delayed occurrence of damages, not with the discovery of the injury. *Sedar v. Knowlton Constr. Co.* (1990), 49 Ohio St.3d 193, 198, 551 N.E.2d 938, 943; see, *Cincinnati Ins. Co. v. Alcorn* (1993), 91 Ohio App.3d 165, 168, 631 N.E.2d 1125, 1126–1127; *Point E., supra,* at 714, 663 N.E.2d at 350; *Bd. of Edn. v. Dela Motte–Larson* (Dec. 21, 1989), Cuyahoga App. No. 56272, unreported, 1989 WL 155155. "The *Velotta* decision is concerned solely with accrual of a cause of action for purposes of a statute of limitations, not with discovery of injury or damages which have already occurred." *Sedar,* 49 Ohio St.3d at 198, 551 N.E.2d at 943.

In the present case, there is no dispute that the roof at the Sperry Building began to leak almost immediately after installation of the BOSS system by Smith in July 1984. Wessel notified Smith about the leakage sometime in late July or August of that year. Even though Smith was hired by SMI in August 1984 to repair the roof under SMI's 12–year warranty, the roof continued to leak year after year.

Appellants, in their final amended complaint, related in their claim of negligent construction that "the water caused serious damages" to Aluminum's inventory and equipment, forcing it to place tarps over the equipment. As a result, Aluminum lost "valuable production time and profits." Appellants also alleged that Smith's attempts to repair the roof "only exacerbated the problem and caused additional damages."

Under these circumstances, appellants cannot deny that they were fully aware of the actual damages caused by the leaking roof in late 1984 at the latest.[3] Since appellants did not file their complaint against Smith until 1991, when it should have been filed in late 1988 at the latest, the trial court correctly entered summary judgment in favor of Smith on appellants' negligent construction claim as being filed outside the time limit imposed by R.C. 2305.09(D). See *Flair,* 96 Ohio App.3d 353, 645 N.E.2d 82, (R.C. 2305.09[D] began to run when third

---

3. The trial court found that the contract between appellants and Smith for the installation of the roof expired on August 13, 1984 when SMI hired Smith to repair the roof under the warranty. The court determined, however, that the statute of limitations began to run in July 1984, since the damages occurred when Smith installed the roof.

incident of damaged cement should have alerted plaintiff to widespread problem); *Portale v. Berkshire Condominium Owners Assn.* (Oct. 13, 1994), Cuyahoga App. No. 66793, unreported, 1994 WL 568332 (application of R.C. 2305.09[D] to appellants' negligence claim for failure to repair the sewer lines in a workmanlike manner reveals complaint untimely filed because cause of action arose when appellants suffered immediate injury which they attributed to negligent repair work notwithstanding subsequent repair work); *Dela Motte–Larson* (R.C. 2305.09[D] began to run on the date when roof at high school initially leaked); compare *Alcorn*, 91 Ohio App.3d 165, 631 N.E.2d 1125 (though cracking tiles evidenced poor workmanship, R.C. 2305.09[D] began to run when actual damages occurred upon removal of floor); *Point East* (though sprinkler system at condominium complex initially leaked in 1980, R.C. 2305.09[D] began to run in 1987 when leaks resurfaced since 1980 leaks were assumed to be corrected and subsequent leaks were related to post–1980 installation); *Bd. of Edn. School Dist. v. Regner* (Oct. 26, 1989), Cuyahoga App. Nos. 56053, 56054, 56060, unreported, 1989 WL 129104 (since it was unclear when plaintiff knew of leaking condition of roof due to improperly authenticated affidavits, issue of fact remained regarding accrual date under R.C. 2305.09[D] ).

Appellants rely on this court's decision in *Cleveland City School Dist. Bd. of Edn. v. Lesko & Assoc.* (Apr. 12, 1990), Cuyahoga App. No. 56592, unreported, 1990 WL 43640, wherein the discovery rule was applied to negligent construction cases notwithstanding the fact that the Supreme Court of Ohio failed to cite the discovery rule in *Velotta* to support its reasoning. This court in *Lesko* stated the following with regard to when a cause of action accrues on a claim for negligent construction, specifically, construction which resulted in leakage:

"[A] cause of action for negligent construction accrues when there is a cognizable event whereby the plaintiff discovers or should have discovered that the injury was related to the defendant's act or non-act and the plaintiff is put on notice of a need to pursue possible remedies against the defendant or when the relationship between the parties for that particular transaction or undertaking terminated whichever occurs later. * * *

" * * * *

" * * * A problem (such as a leak) requiring an initial investigation is not the same as notice that the leak is related to the conduct of the defendant and does not place the plaintiff on notice of the need to pursue remedies."

As stated above, appellants propose that they had four years from 1989 in which to file a negligent construction claim against Smith because their relationship with him terminated in 1988. In other words, since *Lesko* provides the option of discovery or the termination of a relationship as the cognizable event

which triggers the running of R.C. 2305.09(D), appellants timely filed their complaint.

The Supreme Court of Ohio expressed its view in *Sedar* that the *Velotta* holding is not a discovery rule. *Sedar,* 49 Ohio St.3d at 198, 551 N.E.2d at 943. *Sedar* thus made clear that this court's prior characterization of *Velotta*'s holding as a discovery rule in *Lesko* and *Cleveland City School Dist. Bd of Edn. v. URS Company, Inc.* (Dec. 7, 1989), Cuyahoga App. No. 56260, unreported, 1989 WL 147663, was not in harmony with *Velotta.*

Furthermore, *Lesko* cites *Zimmie v. Calfee, Halter & Griswold* (1989), 43 Ohio St.3d 54, 538 N.E.2d 398, *Allenius v. Thomas* (1989), 42 Ohio St.3d 131, 538 N.E.2d 93, *Omni–Food & Fashion, Inc. v. Smith* (1988), 38 Ohio St.3d 385, 528 N.E.2d 941, and *Hershberger v. Akron City Hosp.* (1987), 34 Ohio St.3d 1, 516 N.E.2d 204, in support of termination of relationship as a triggering event. These cases deal with alleged medical and attorney malpractice.

In *Dela Motte–Larson,* this court reviewed *Investors REIT One v. Jacobs* (1989), 46 Ohio St.3d 176, 546 N.E.2d 206 and recognized that the discovery rule adopted by the Supreme Court of Ohio and the General Assembly for bodily injury claims brought under R.C. 2305.10 and the discovery rules used for medical and legal malpractice claims brought under R.C. 2305.11(D) are not available to negligence claims brought under R.C. 2305.09(D). *Investors REIT One,* 46 Ohio St.3d at 181, 546 N.E.2d at 210–211. *Lesko* attempted to show that the Supreme Court of Ohio only expressed dictum, and not binding or controlling law, in this regard. However, *Investors REIT One* contains strong language which cannot be ignored that the General Assembly never extended the discovery rule to general negligence claims arising under R.C. 2305.09. *Id.* See, also, *Herbert v. Banc One Brokerage Corp.* (1994), 93 Ohio App.3d 271, 638 N.E.2d 161. Therefore, the triggering event of termination of relationship available in medical and legal malpractice cases is not available in negligent construction cases by implication.

Finally, in *Lesko,* no evidence was presented to the trial court as to when the board of education was first aware of the leaks, or any other defects. Herein, Wessel himself notified Smith about the leaks almost immediately after installation, and subsequent costly repairs failed to remedy the leakage. Under these circumstances, appellants were put on notice in late 1984 to investigate the roof's installation. *Lesko* is thus factually distinguishable from the present case.[4]

---

4. The trial court, based on its determination that the business relationship terminated between appellants and Smith on August 13, 1984, found that assuming *arguendo* that *Lesko* 's "termination of relationship" triggering event was applicable, appellants still failed to timely file their negligent construction complaint.

In conclusion, appellants failed to demonstrate a genuine issue of material fact with regard to their negligent construction claim. The trial court, therefore, properly granted summary judgment in Smith's favor as to this claim.

### B

Appellants' next argument pertains to their claim against Smith for breach of an oral contract. Appellants argue that the trial court erred in granting summary judgment based upon R.C. 2305.07 because they filed their complaint within six years of the alleged breach as required by the statute.

A breach occurs upon any failure to perform a contractual duty. *Kotyk v. Rebovich* (1993), 87 Ohio App.3d 116, 121, 621 N.E.2d 897, 900–901, citing Restatement of the Law 2d, Contracts (1978), Section 235(2). There is no dispute that the statute of limitations on an oral contract is six years. See R.C. 2305.07; *Kotyk* at 121, 621 N.E.2d at 900–901; *Fieg Sewering Co. v. Romaniw* (Feb. 8, 1990), Cuyahoga App. No. 56526, unreported, 1990 WL 90033728. The cause of action arises when the plaintiff discovers the failure to perform as agreed in the oral contract. *Kotyk* at 121, 621 N.E.2d at 900–901.

In this case, appellants and Smith entered into an oral contract for the installation of the BOSS system in the spring of 1984. Aluminum paid $70,000 to Smith in June 1984 toward the installation, and remitted the remaining balance sometime before the completion of the project in mid-July 1984. As stated above, there is no dispute that the roof began to leak almost immediately after installation. Since the oral contract was completed in July 1984, and the leaking occurred almost simultaneously, appellants were on notice that Smith allegedly failed to satisfy the contract even at the time of the first leak.[5] The trial court, therefore, did not err in entering summary judgment in favor of Smith, since appellants waited until 1991 to file their claim for breach of an oral contract. R.C. 2305.07; *Kotyk*.

### C

Appellants' final claim against Smith was for fraudulent concealment. Appellants charge that Smith fraudulently concealed defects and installation methods, but the trial court granted summary judgment on this claim based upon either Civ.R. 9(B) or the four-year statute of limitations contained in R.C. 2305.09(C).

---

5. Appellants are not charging Mr. Smith with breach of any warranties related to his repairs to the roof.

The Supreme Court of Ohio identified the six elements of a claim of fraud in *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101. These elements are:

"1) a representation or, where there is a duty to disclose, concealment of a fact,

"2) which is material to the transaction at hand,

"3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

"4) with the intent of misleading another into relying upon it,

"5) justifiable reliance upon the representation or concealment, and

"6) a resulting injury proximately caused by the reliance." *Id.,* paragraph two of the syllabus. See *Gaines v. Preterm–Cleveland, Inc.* (1987), 33 Ohio St.3d 54, 514 N.E.2d 709; *Pollock v. Kanter* (1990), 68 Ohio App.3d 673, 589 N.E.2d 443.

 Civ.R. 9(B) requires that whenever a party avers fraudulent concealment, a fraud-type claim, "the circumstances constituting fraud * * * shall be stated with particularity" in the complaint. The "circumstances constituting fraud" include the time, place and content of the false representation; the fact misrepresented; the identification of the individual giving the false representation; and the nature of what was obtained or given as a consequence of the fraud. *Pollock,* 68 Ohio App.3d at 681–682, 589 N.E.2d at 448; *Korodi v. Minot* (1987), 40 Ohio App.3d 1, 4, 531 N.E.2d 318, 321–322.

 The underlying determination in each case is whether the allegations are specific enough to inform the defendant of the act of which the plaintiff complains so as to allow the defendant to prepare an effective response and defense. *Baker v. Conlan* (1990), 66 Ohio App.3d 454, 458, 585 N.E.2d 543, 545–546. However, Civ.R. 9(B) should be read in conjunction with the general directive of Civ.R. 8 that pleadings should be "simple, concise, and direct." *F & J Roofing Co. v. McGinley & Sons, Inc.* (1987), 35 Ohio App.3d 16, 17, 518 N.E.2d 1218, 1220. Therefore, even though pleadings may be vague, if the defendant has notice of matters of which the plaintiff complains, a strict application of Civ.R. 9(B) serves no useful purpose. *Id.* at 18, 518 N.E.2d at 1220.

Appellants' amended complaint reads as follows on their claim for fraudulent concealment:

"Defendants intentionally concealed the defects in the materials used in and methods of installing the roof of the Sperry Building. The subsequent repairs continued this concealment of defective work and materials. Only upon an independent investigation in 1988 and 1989 by Plaintiffs and by the Beck Company, did Plaintiffs learn of this intentional concealment.

"* * *

"[P]laintiffs further believe that they have the right to rely upon the promises and representations, made as late as early 1988, by Defendant Smith personally and by the other Defendants, that a proper roof would be installed by curing the roof problems that arose after 1984. Plaintiffs believe that they were only aware of the fraudulent concealment by Defendants after mid–1989 when they were forced to hire another company to install a new roof on the Sperry Building at considerable expense."

Though these allegations contain no exact facts as to time or place, or as to the type of defects complained of, appellants' complaint reveals that they accused Smith of misrepresenting the actual condition of the roof either at the time of installation or at the time of subsequent repairs. Appellants alleged that Smith knew about the defective condition of the roof but falsely represented that the roof could be repaired, a representation accepted by appellants until 1988 and 1989 when an investigation revealed the defective nature of the roof. Keeping in mind the liberal application of Civ.R. 9(B), appellants' complaint should have survived a Civ.R. 9(B) attack.

 Notwithstanding this conclusion, appellants' complaint for fraudulent concealment had to survive a statute of limitations attack as well. R.C. 2305.09(C) governs, setting forth a statute of limitations of four years. With regard to this time period:

"Under Ohio Revised Code 2305.09, a cause of action for fraud must be brought within four years after the fraud was *or should have been discovered.* No more than a reasonable opportunity to discover the fraud is required to start the period of limitation. *Gaudin v. K.D.I. Corp.,* 417 F.Supp. 620, 629 (S.D.Ohio 1976) aff'd, 576 F.2d 708 (6th Cir.1978). Information sufficient to alert a reasonable person to the possibility of wrongdoing gives rise to a party's duty to inquire into the matter with due diligence. *Militsky v. Merrill, Lynch, Pierce, Fenner and Smith,* 540 F.Supp. 783, 787 (N.D.Ohio 1980). Once sufficient indicia of fraud are shown, a party cannot rely on its unawareness or the efforts of the opposition to lull it into a false security to toll the statute. *Id.* at 786–787. (Emphasis added.)" *Au Rustproofing Ctr. v. Gulf Oil Corp.* (C.A.6, 1985), 755 F.2d 1231, 1237. See *Investors REIT One, supra,* paragraph two of the syllabus.[6]

---

**6.** This court recognizes that the Supreme Court of Ohio in *Investors REIT One* rejected the application of the discovery rule to cases of mere concealment, as opposed to pure fraud cases, for purposes of determining accrual dates. *Investors REIT One,* 46 Ohio St.3d at 182, 546 N.E.2d at 211–212; see, *Squire v. Guardian Trust Co.* (1947), 79 Ohio App. 371, 35 O.O. 144, 72 N.E.2d 137. Allegations of mere concealment, therefore, fail to toll the statute of limitations contained in R.C. 2305.09. *Id.*

Appellants filed their complaint for fraudulent concealment in the trial court on April 15, 1991. If appellants discovered or should have discovered the fraudulent concealment before April 15, 1987, their claim would have lapsed pursuant to R.C. 2305.09(C).

The roof of the Sperry Building began to leak immediately after the installation of the BOSS system in mid-July 1984. SMI representatives and Smith thereafter inspected the roof in the presence of Wessel. Wessel learned after the inspection that the "SMI cap, which clamped the rubber sheeting to the button affixed to the roof deck, was scoring the rubber sheets in such a manner to create a cut or perforation which allowed water to seep through the rubber sheeting to the roof deck below." Wessel requested that the rubber sheeting be removed and replaced to prevent further leakage. The repair was completed by September 13, 1984.

Applying R.C. 2305.09(C) to this chain of events, if appellants based their fraudulent concealment claim on Smith's fraudulent concealment of a defect in the original installation, *i.e.*, the scoring of the rubber sheets, Wessel possessed this knowledge prior to the completion of the repair in September 1984. Therefore, this knowledge triggered the four-year statute of limitations, requiring the filing of the complaint by September 13, 1988. See *Gardens of Bay Landing* (appellant's cause of action for fraud accrued under R.C. 2305.09[D] at time of notice of negligent construction since misrepresentations regarding structural soundness would be discovered at the time the damage was revealed).

If, on the other hand, appellants' claim for fraudulent concealment was based on Smith's continued concealment of a defect in the roof throughout 1985, 1986, 1987 and part of 1988, considering Wessel's knowledge of a defect in the roof in 1984 which caused leakage, appellants should have suspected that the continued leakage may be due to a similar defect prior to April 15, 1987. Under the standards expressed in *Au Rustproofing Center* and *Investors REIT One,* if the trial court granted summary in favor of Smith on a continuing concealment, it did so properly.

Assuming *arguendo* that appellants timely filed their fraudulent concealment complaint, Smith, in a supplemental affidavit in support of his motion for summary judgment, stated the following:

"3. At the time the original SMI rubber roof, marketed by SMI as the BOSS system, was installed on Plaintiffs' Sperry Circle building, I had no knowledge of any problem previously experienced by the installation of such a roof system, and did not learn of any problem until after the roof was originally installed and leakage was experienced. * * *

" * * *

"7. The repair/replacement of the roof between August 13, 1984 and September 13, 1984 was not accomplished with the intent to deceive, mislead or conceal any leaking problem, but was done in order to correct a problem which had emerged following the original installation * * *

"8. The repairs made to the roof by my company subsequent to September 13, 1984, were done under the SMI warranty, and largely consisted of replacing patches which had become loose or detached over time from the rubber sheeting to which they were affixed.

"9. Such repair occurred whenever notified by Plaintiffs or their employees of a leaking problem, and work done to replace these patches was performed in order to stop the leakage, and not for the purpose, or with the intent, of concealing any defect."

Appellants' response to Smith's motion for summary judgment, including the supplemental affidavit, failed to establish the existence of a genuine issue of material fact regarding a claim for fraudulent concealment. Appellants presented the trial court with affidavits from Wessel and Robert E. Seiler, an engineer, to refute Smith's denial that he concealed any defects at any time. Wessel's affidavit contains his unverified statement that Smith concealed defects both at the time of installation and repair. Seiler's affidavit contains the statements that the use of a bonding adhesive rather than a splicing adhesive contributed to the leaky roof, a problem which surfaced because of inadequate labeling of cans. Seiler stated that this problem "had to have been approved by Brad Smith." He also stated that Brad Smith should have realized the possibility of failure caused by the use of improper adhesive on patches installed to cover existing holes, or potential holes in the existing membrane.

These speculative allegations of Seiler and Wessel do not sufficiently overcome Smith's motion for summary judgment. Absent from Seiler's or Wessel's affidavits are any statements which contradict Smith's statements in his affidavit that he completed all repair work with the intent to prevent any more leaks, and not with the intent to conceal defects, and additionally that he never knew of any defects or concealed them from appellants. Appellants thus failed to create a genuine issue of material fact with regard to their claim for fraudulent concealment. *Burr; Pollock.* The trial court, therefore, properly granted summary judgment in favor of Smith on this claim if it did so based upon the elements necessary for a claim of fraud.

Appellants' first assignment of error is overruled.

### D

Appellants' second assignment of error relates to the trial court's alleged improper grant of summary judgment in favor of defendant-appellee, ERA.

Appellants seek to hold ERA liable for the alleged faults of SMI, specifically breach of warranty and fraudulent concealment, under the theory of successor liability.

Prior to 1986, Senergy Corporation ("Senergy"), a Rhode Island corporation, was engaged in the roofing trade under the corporate name Syenergy Methods, Incorporated ("SMI–RI"). SMI–RI sold the roofing business to SMI, a Connecticut-based corporation, including the liabilities relating to the business. SMI–RI, operating as Senergy, was thereafter no longer involved in the roofing industry.

The Connecticut National Bank ("Connecticut") foreclosed on SMI's assets in 1990 due to financial difficulties experienced by the corporation. ERA, a known competitor to SMI, purchased SMI's assets at a public auction held by Connecticut. Though Connecticut was unwilling to sell certain assets of SMI at the foreclosure sale, it permitted ERA to purchase the assets directly from SMI. These assets included SMI's tradenames, logos, and customer and warranty lists. ERA never expressly agreed, in writing or otherwise, to assume SMI's liabilities.

 The test for successor liability is set forth in *Flaugher v. Cone Automatic Machine Co.* (1978), 30 Ohio St.3d 60, 30 OBR 165, 507 N.E.2d 331, a case dealing with successor liability in the context of products liability. A purchaser of a corporation's assets is not liable for the liability(ies) of the seller corporation unless (1) there is an express or implied assumption of such liability, or (2) the sale of assets amounts to a de facto merger or consolidation, or (3) the purchaser corporation is a mere continuation of the seller corporation, or (4) the transaction is a fraudulent attempt to escape liability. *Id.* at 62, 30 OBR at 167–168, 507 N.E.2d at 333–334. The Supreme Court of Ohio applied the *Flaugher* test to contractual obligations of a predecessor in *Welco Industries, Inc. v. Applied Cos.* (1993), 67 Ohio St.3d 344, 617 N.E.2d 1129. See *Buckholz v. First Fed. Sav. Bank* (1995), 102 Ohio App.3d 400, 657 N.E.2d 346; *Morrison v. Newaygo Eng. & Survey Co.* (June 2, 1994), Cuyahoga App. No. 66023, unreported, 1994 WL 245659.

Appellants herein present the following evidence to support their argument that ERA is liable for SMI's wrongful conduct under successor liability: (1) ERA's purchase of SMI's customer and warranty lists, association memberships, roofing assets, technology, trademarks, logos, and copyrights; (2) ERA's use of SMI's production facility after the sale and its continuation of SMI's lease for its Connecticut headquarters; (3) ERA's retention of SMI's employees; (4) the ceasing of SMI's business; (5) a former owner of SMI became an Executive Vice-President at ERA; (6) a news release which stated, "ERACORP is in full swing marketing the complete line of Syenergy products and systems"; and (7) the sale of certain assets of SMI for $1.

■ Under *Flaugher*, if ERA expressly or impliedly agreed to assume SMI's liabilities upon the purchase of SMI's assets, ERA is liable for SMI's wrongful conduct. ERA attached an affidavit of Roy E. Ahern, ERA's president, to its motion for summary judgment. Ahern stated therein that ERA purchased the following from SMI: some furniture and equipment from SMI, but neither purchased receivables nor assumed any debts; tradenames, logos, and other intangible assets with permission of Connecticut; and a customer list and a warranty list "as a list of prospective customers and past customers but did not execute any document or otherwise agree to assume any of the obligations of SMI including warranty obligations." Ahern also set forth that ERA hired some of SMI's employees because of their experience, and two individuals involved with SMI became officers of ERA for about a year, but were never members of the board of directors. The affidavit shows further that Ahern was the sole shareholder of ERA; therefore, no former associates of SMI either owned ERA stock or had any form of equity interest in ERA. Finally Ahern stated, "At no time did any of the acts of Era in purchasing assets at the public sale or pursuant to the documents attached did Era ever become obligated to assume warranty obligations of SMI and it received no consideration for assumption of such obligations * * *."

Appellants' response to ERA's denial that it either expressly or impliedly assumed SMI's liabilities is an argument of logic. They argue that it is only logical to assume that ERA's purchase of SMI's warranty list meant that it assumed the warranty liabilities absent any written disclaimer. However, ERA explicitly denied that it assumed these liabilities, either expressly or impliedly, through its president's affidavit, which is not factually disputed by appellants. This court agrees with ERA that ERA's "mere purchase of a list of names does not, by implication, bind Era to service [the] warranties * * *" absent any evidence to the contrary. ERA cannot, therefore, be held liable as a successor to SMI under the first *Flaugher* exception.

■ The court in *Welco, supra,* issued the following guidelines with regard to the *de facto* merger doctrine, the second *Flaugher* exception:

"A de facto merger is a transaction that results in the dissolution of the predecessor corporation and is in the nature of the total absorption of the previous business into the successor. *Flaugher, supra,* 30 Ohio St.3d at 71, 30 OBR at 175, 507 N.E.2d at 340 (A.W. Sweeney, J., dissenting). A de facto merger is a merger in fact without a declaration as such. The hallmarks of a de facto merger include (1) the continuation of the previous business activity and corporate personnel, (2) a continuity of shareholders resulting from a sale of assets in exchange for stock, (3) the immediate or rapid dissolution of the predecessor corporation, and (4) the assumption by the purchasing corporation of

all liabilities ordinarily necessary to continue the predecessor's business operations. *Turner [v. Bituminous Cas. Co.* (1976)], 397 Mich. [406] at 420, 244 N.W.2d [873] at 879. One court has indicated that a transfer of assets for stock is the sine qua non of de facto merger. *Travis v. Harris Corp.* (C.A.7, 1977), 565 F.2d 443, 447." *Welco,* 67 Ohio St.3d at 349, 617 N.E.2d at 1134. See *McGaw v. S. Bend Lathe, Inc.* (1991), 74 Ohio App.3d 8, 598 N.E.2d 18; *Morrison.*

Applying these factors to ERA's purchase of SMI, there is no dispute that the purchase occurred at a public auction and did not involve any transfers of stock for assets. In fact, none of SMI's shareholders became shareholders of ERA stock. SMI moreover dissolved before the purchase, and did not continue as a going concern or merge into ERA. Finally, as this court found above, there is no evidence in the record which supports appellants' assertion that ERA assumed SMI's liabilities. Since the factors necessary for a *de facto* merger are not present in this case, ERA cannot be held liable for SMI's wrongful conduct under the *Flaugher de facto* merger exception.

 Pertaining to the "mere-continuation" theory, the third exception under *Flaugher,* the *Welco* court applied a narrow "traditional mere-continuation" theory, stating as follows:

"We have held that the basis of this theory is the continuation of the corporate entity, not the business operation, after the transaction. *Flaugher, supra.* Such would be the case when "one corporation sells its assets to another corporation with the same people owning both corporations. Thus, the acquiring corporation is just a new hat for, or reincarnation of, the acquired corporation. This is actually a reorganization." *Turner, supra,* 397 Mich. at 449, 244 N.W.2d at 892. This type of transaction is executed to escape liabilities of the predecessor corporation. *Cyr [v. B. Offen & Co., Inc.* (C.A.1, 1974), 501 F.2d 1145] at 1151, 1153. Because the goal is to escape liability, inadequacy of consideration is one of the indicia of mere continuation. *Jackson v. Diamond T. Trucking Co.* (1968), 100 N.J.Super. 186, 196, 241 A.2d 471, 477." *Welco,* 67 Ohio St.3d at 350, 617 N.E.2d at 1134.

 ERA's president, Ahern, admitted in his affidavit that ERA maintained an office in Connecticut for approximately one year following the purchase. He also admitted that ERA hired some of SMI's employees because of their expertise in the roofing industry. One of SMI's former owners became an ERA officer, but he did not own any ERA stock or sit on its board of directors. Merely sharing the same physical plant, employees and continuing to market some products of SMI by ERA is not sufficient to establish liability under the mere-continuation theory. See *Welco,* 67 Ohio St.3d at 350, 617 N.E.2d at 1134;

*Morrison; Semirale v. Rhea* (May 19, 1994), Cuyahoga App. No. 65906, unreported, 1994 WL 197219.

The record demonstrates that ERA and SMI were virtual strangers, albeit competitors, prior to the sale. This was a relevant factor in *Welco*. There is no evidence to support the conclusion that SMI transformed into ERA as a result of the same people owning or operating both corporations. Finally, not only is there no evidence to indicate that SMI became ERA merely to escape liabilities, but Connecticut, a disinterested party, authorized ERA's purchase of SMI's assets, both at public auction and afterwards. Accordingly, ERA is not a mere continuation of SMI under the *Welco* test.

The only remaining basis to impose SMI's liabilities on ERA is through the fourth exception of *Flaugher*, i.e., that a purchasing corporation is liable for the wrongful conduct of the seller corporation if the sale was entered into fraudulently in order to escape liability. This exception is totally inapplicable to ERA's purchase of SMI because ERA purchased SMI at public auction for the purpose of repaying SMI's debt to Connecticut. The purchase of SMI's assets, including SMI's tradenames, logos, copyrights, and customer and warranty lists, was authorized by Connecticut. There is no evidence in the record which places the propriety of the sale into doubt or otherwise suggests that the sale occurred so as to evade liabilities.

In conclusion, ERA can be held liable for SMI's wrongful conduct, including breach of warranty, only if one of the four exceptions outlined in *Flaugher* applies to its purchase of SMI. *Flaugher*, 30 Ohio St.3d at 62, 30 OBR at 167–168, 507 N.E.2d at 334. This court's review of the record fails to disclose a genuine issue of material fact with regard to any of these exceptions. All the record shows is that ERA, a competitor of SMI, took advantage of a business opportunity by purchasing SMI's liquidated assets, but did not assume any of SMI's liabilities. "The sale of a corporation's assets is an important tool in raising liquid capital to pay off corporate debts." *Welco*, 67 Ohio St.3d at 348–349, 617 N.E.2d at 1133. The trial court, therefore, properly granted summary judgment in favor of ERA, finding it not to be a successor corporation to SMI.[7]

Appellants' second assignment of error is overruled.

*Judgment affirmed.*

James D. Sweeney, P.J., and Karpinski, J., concur.

---

7. The fact that SMI's twelve-year warranty expressly stated that it "shall apply to and bind the parties, their respective successors and assigns" does not alter our conclusion. In order for the warranty to be binding, appellants had to show that ERA was a "successor or assign," a burden it did not carry in the trial court or in this court.

## APPENDIX

The court of common pleas should not have granted summary judgment to either James Bradley Smith or ERA Corporation because genuine issues of material fact exist, and neither Smith nor ERA Corporation is entitled to judgment as a matter of law.

1. ALPCO [Aluminum] commenced its action charging Smith with negligent installation of the roof prior to the expiration of the statute of limitations for an action in negligent construction.

2. ALPCO commenced its action charging Smith with breach of an oral contract prior to the expiration of the applicable statute of limitations.

3. ALPCO commenced its action charging Smith with fraudulent concealment of defects in the roofing materials used and the methods of installing the roof prior to the expiration of the statute of limitations for an action based on fraud.

4. The trial court erred when it granted summary judgment in favor of ERA Corporation because plaintiffs-appellants' pleadings and the evidence presented genuine issues of material fact, and ERA Corporation is not entitled to judgment as a matter of law.

5. The trial court erred in granting summary judgment; ERA is liable to ALPCO because ERA is a mere continuation of SMI–CT [SMI].