[This opinion has been published in *Ohio Official Reports* at 76 Ohio St.3d 508.]

THE STATE EX REL. TOLEDO EDISON COMPANY, APPELLANT, *v*. CITY OF CLYDE ET AL., APPELLEES.

[Cite as *State ex rel. Toledo Edison Co. v. Clyde*, 1996-Ohio-376.]

*Municipal corporations—Public utilities—Section 3 of Clyde Ordinance 1995-01 violates the Miller Act with respect to termination of Toledo Edison Company's service to existing facilities inside Clyde—Section 3 of Clyde Ordinance 1995-01 not subject to Miller Act regarding new facilities.*

(No. 95-1358—Submitted April 15, 1996—Decided August 28, 1996.)

APPEAL from the Court of Appeals for Sandusky County, Nos. S-88-046 and S-95-002.

————————————

{¶ 1} In July 1965, the Toledo Edison Company ("Toledo") acquired, by warranty deed, the electric generating, transmission, and distribution system then owned and operated by the village (now city) of Clyde, and received a twenty-five-year nonexclusive franchise to provide electricity to Clyde's inhabitants.

{¶ 2} In 1987, Clyde exercised its rights under Section 4, Article XVIII of the Ohio Constitution and re-established a municipal electric system. The next year, two years before the franchise agreement expired, Clyde's city council authorized Clyde to build a duplicate electric distribution system to provide electric service to its inhabitants. Later that same year, Toledo asked Clyde to renew the nonexclusive franchise agreement for an additional twenty-five years. Clyde declined.

{¶ 3} Toledo then initiated a mandamus proceeding, case No. S-88-046, against Clyde, its mayor, its city manager, and its city council members, claiming that construction of a duplicate system and failure to renew the franchise forced Toledo to abandon or withdraw from its existing electric distribution facilities and

system in Clyde. Toledo argued that Clyde must obtain approval from the Public Utilities Commission of Ohio before requiring Toledo to abandon its existing electrical distribution facilities or withdraw from its electric service inside Clyde. Toledo requested an order directing Clyde to file an application with the commission seeking approval to require Toledo to abandon its facilities and withdraw its electric service from Clyde.

**{¶ 4}** Subsequently, the court of appeals adopted in its judgment entry the parties' settlement agreement in case No. S-88-046, as follows:

"Toledo Edison and the City of Clyde hereby agree that, in the event that the City of Clyde determines to undertake any action requiring the cessation of electric service in Clyde by Toledo Edison, or requiring the withdrawal or abandonment of Toledo Edison's facilities within the City of Clyde, the City of Clyde shall comply with Ohio Revised Code Section 4905.21. Notwithstanding the expiration of the franchise described in paragraph 1 above, the City of Clyde shall not require Toledo Edison to abandon or withdraw its facilities within the City of Clyde, or the electric service rendered thereby, unless and until the City of Clyde obtains an order from the Public Utilities Commission of Ohio, approving such abandonment or withdrawal."

**{¶ 5}** The settlement agreement also stated that it did not grant a franchise to Toledo. Neither party appealed the order adopting the settlement agreement.

**{¶ 6}** On January 3, 1995, Clyde's city council gave the first reading of Ordinance 1995-01. As passed on January 17, 1995, the ordinance reads as follows:

"SECTION 2. There is presently no provider of electric, water or sewer utility services, other than the City of Clyde and its utility departments, that is authorized by the City of Clyde under Article XVIII of the Constitution of the State of Ohio, to provide such utility services within the corporate limits of the City of Clyde.

"SECTION 3. On and *after the effective date of the ordinance, all utility service arrangements for electric*, water or sewer *utility service within the corporate limits of the City of Clyde,* as the same may be altered from time to time through annexation or otherwise, *shall be made with the City of Clyde's electric*, water or sewer *utilities*.

"SECTION 4. This ordinance shall not affect utility services or products currently provided at transmission voltages of approximately 69,000 volts or more. Nor shall this ordinance affect utility service arrangements between individual residents of the City of Clyde and providers of utility services other than the City of Clyde, if such arrangements are existing and in place as of the effective date of this Ordinance. Such arrangements are hereby permitted to continue, at the option of the residents having such arrangements, until such time as the City of Clyde obtains such authorization or approval as may be required under the laws of the State of Ohio to cause such existing arrangements to be terminated and utility service provided by the City of Clyde to be substituted for the service provided under such other arrangements." (Emphasis added.)

{¶ 7} That same day, Resolution No. 1995-04 was passed, instructing the city solicitor to initiate abandonment proceedings before the commission seeking to replace electric service inside Clyde's city limits with service by Clyde and also seeking removal of Toledo's distribution system from inside Clyde's city limits. An application in accordance with the resolution was filed the next day with the commission, case No. 95-02-EL-ABN.[1] The application did not seek commission approval of Section 3 of Ordinance 1995-01.

---

1. On April 11, 1996, the commission issued its opinion and order denying Clyde's abandonment application in case No. 95-02-EL-ABN, because that application was not in the public interest. The commission held that the application had an extraterritorial impact and failed to address the issue of Toledo's stranded investment. However, the commission noted that Clyde could file another application sometime in the future.

**{¶ 8}** Two weeks later, Toledo filed a new mandamus action against Clyde, case No. S-95-002, and a separate motion for contempt against Clyde in case No. S-88-046, alleging that Section 3 of Ordinance 1995-01 violated R.C. 4905.21 and the judgment entry in case No. S-88-046 because Section 3 closed some or all of Toledo's lines for service. Toledo requested a writ of mandamus ordering Clyde to obey R.C. 4905.21 by filing an application with the commission for permission to require Toledo to abandon its lines within Clyde and prohibiting the second reading, enactment, or enforcement of Ordinance 1995-01 to the extent that it violated the writ of mandamus.

**{¶ 9}** Clyde moved to dismiss Toledo's new mandamus complaint. The parties then stipulated that the case involved only one substantive legal issue: "Whether the Clyde Respondents violated this Court's Journal Entry of April 24, 1989 or the Miller Act by not requesting in Clyde's Miller Act application at the Public Utilities Commission authorization for the requirement imposed by Section 3 of the City of Clyde Ordinance No. 1995-01 that all future utility service arrangements be made with the City of Clyde."

**{¶ 10}** Clyde then filed its answer to the mandamus complaint, asserting that the complaint failed to state a claim upon which relief could be granted, that the court lacked jurisdiction to grant the injunctive relief requested, that Toledo had a plain and adequate remedy at law, and that Toledo lacked standing as a relator under R.C. 2731.02.

**{¶ 11}** The court of appeals stated that Section 3 of Clyde Ordinance 1995-01 did not apply to anyone currently receiving service from Toledo and that Clyde was otherwise in compliance with the April 24, 1989 judgment entry and R.C. 4905.21. The court then held, without explanation, that Section 3 of Clyde Ordinance 1995-01 did not violate R.C. 4905.21, and that Clyde need not seek or obtain commission approval before enforcing that section of its ordinance. The court of appeals then found Toledo's complaint not well taken.

**{¶ 12}** The cause is now before this court upon an appeal as of right.

———————————

*Richard W. McLaren, Jr.,* for appellant.

*Duncan & Allen, Gregg D. Ottinger* and *John P. Coyle*; *Homan & Pearce* and *William D. Pearce,* for appellee.

*Chester, Willcox & Saxbe, John W. Bentine* and *Jeffrey L. Small*, urging affirmance for *amicus curiae*, American Municipal Power-Ohio, Inc.

———————————

*Per Curiam.*

**{¶ 13}** In order to obtain a writ of mandamus, the relator must show "that the relator has a clear legal right to the relief prayed for, that the respondent is under a legal duty to perform the requested act, and that relator has no plain and adequate remedy at law." *State ex rel. Fostoria Daily Review Co. v. Fostoria Hosp. Assn.* (1988), 40 Ohio St.3d 10, 11, 531 N.E.2d 313, 314. For the reasons that follow, we reverse the decision of the court of appeals and find that Section 3 of Clyde Ordinance 1995-01 violates the Miller Act with respect to the termination of Toledo's service to existing facilities inside Clyde, but affirm the decision of the court of appeals that Section 3 of Clyde Ordinance 1995-01 is not subject to the Miller Act regarding new facilities.

**{¶ 14}** Under Section 4, Article XVIII of the Ohio Constitution, "[a]ny municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the product or service of which is or is to be supplied to the municipality or its inhabitants, and may contract with others for any such product[s] or service." Thus, Clyde had constitutional authority to build a municipal utility to serve its inhabitants. *Wooster v. Graines* (1990), 52 Ohio St.3d 180, 181, 556 N.E.2d 1163, 1164. This right is not generally subject to statutory restriction. *Lucas v. Lucas Local School Dist.* (1982), 2 Ohio St.3d 13, 2 OBR 501, 442 N.E.2d 449; *Columbus v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 427, 12

O.O.3d 361, 390 N.E.2d 1201; *Columbus v. Ohio Power Siting Comm.* (1979), 58 Ohio St.2d 435, 12 O.O.3d 365, 390 N.E.2d 1208.

{¶ 15} However, municipal utility operations are subject to statewide police power limitations for health and safety reasons, for example, water fluoridation (*Canton v. Whitman* [1975], 44 Ohio St.2d 62, 73 O.O.2d 285, 337 N.E.2d 766), approval of sewage projects (*Delaware Cty. Bd. of Commrs. v. Columbus* [1986], 26 Ohio St.3d 179, 184, 26 OBR 154, 158-159, 497 N.E.2d 1112, 1117), and designation of a river as a scenic river area (*Columbus v. Teater* [1978], 53 Ohio St.2d 253, 260-261, 7 O.O.3d 410, 414, 374 N.E.2d 154, 159). Moreover, the Miller Act, R.C. 4905.20 and 4905.21, requires municipalities to obtain commission approval before forcing the abandonment of nonmunicipal utility facilities or the withdrawal of nonmunicipal utility services located inside the municipality. See, *e.g., State ex rel. Klapp v. Dayton Power & Light Co.* (1967), 10 Ohio St.2d 14, 39 O.O.2d 9, 225 N.E.2d 230; *State ex rel. Wear v. Cincinnati & Lake Erie RR. Co.* (1934), 128 Ohio St. 95, 190 N.E. 224.

{¶ 16} R.C. 4905.21 provides that any "political subdivision desiring to abandon or close, or have abandoned, withdrawn, or closed for traffic or service all or any part of any [electric] line * * * shall make application to the public utilities commission in writing." It is undisputed that Clyde is a "political subdivision" and that Toledo is a "public utility" within the meaning of the Miller Act. Thus, Clyde must seek commission approval before forcing Toledo to close or abandon its electric lines or service inside Clyde's city limits. Therefore, if enforcing Section 3 of Clyde Ordinance 1995-01 amounts to the forced abandonment of Toledo's facilities or service, then Clyde's ordinance violates the Miller Act.

{¶ 17} This presents us with two issues: First, does the Miller Act require commission review and oversight for the termination of service over single-customer service lines, like the ones at issue here? Second, does the Miller Act give Toledo the right to serve prospective future customers and facilities that might

arise inside Clyde's city limits after the expiration of Toledo's nonexclusive franchise and after Clyde has established its own electric utility and declared its intent to serve all new customers inside Clyde's city limits? We answer the first question in the affirmative, finding that the Miller Act requires commission review regarding the abandonment or closure of all electric lines, regardless of size. As to the second question, we find that under the circumstances presently before us, the Miller Act protects Toledo's existing facilities and service lines, but confers no right upon Toledo to serve new, prospective facilities inside Clyde's city limits.

{¶ 18} A review of the history behind the Miller Act is important in reaching these conclusions. The Miller Act derives from the Gilmore Act (G.C. 504-2 and 504-3, 107 Ohio Laws 525), which prevented railroads and street railway companies from abandoning main track lines without notice and prior approval. See *State ex rel. Wear v. Cincinnati & Lake Erie RR. Co.* (1934), 128 Ohio St. 95, 190 N.E. 224. Accord *Toledo v. Pub. Util. Comm.* (1939), 135 Ohio St. 57, 61-62, 13 O.O. 329, 331, 19 N.E.2d 162, 164. The focus of the Gilmore Act was to protect the public, which had come to rely upon the service that was being provided. *State ex rel. Wear, supra,* 128 Ohio St. 95, 190 N.E. 224. Accord *Detroit, Toledo & Ironton RR. Co. v. Pub. Util. Comm.* (1954), 161 Ohio St. 317, 53 O.O. 220, 119 N.E.2d 73, paragraph three of the syllabus.

{¶ 19} The General Assembly expanded the scope of the Gilmore Act in 1919 to include the provision of utilities, including gas and electric service. G.C. 504-2 and 504-3, as amended by 108 Ohio Laws, Part I, 373. According to a contemporary newspaper account, this expansion, called the Miller Act, was prompted by the East Ohio Gas Company's decision to unilaterally withdraw gas service from the village of Alliance, leaving it without a gas provider. Ohio State Journal, Feb. 27, 1919, at 1. See, also, *Cleveland v. E. Ohio Gas Co.* (1921), 15 Ohio App. 117, 129. Prior to this expansion of the Gilmore Act, public utilities were bound only by the terms of their contracts with municipalities and could

voluntarily forfeit their right to provide service to the municipalities and withdraw their services as their contracts permitted. *St. Clairsville v. Pub. Util. Comm.* (1921), 102 Ohio St. 574, 588-589, 132 N.E. 151, 155, citing *E. Ohio Gas Co. v. Akron* (1909), 81 Ohio St. 33, 90 N.E. 40, see paragraph four of the syllabus.

{¶ 20} "The express purpose of [the Miller Act] is that when a public utility begins 'furnishing service or facilities within the State of Ohio,' regardless of the terms of the [franchise] contract under which it is operating, or under which it began such operation, its right to terminate such service is dependent upon the conclusions of the public utilities commission rather than upon the terms of the contract * * *." *E. Ohio Gas Co. v. Cleveland* (1922), 106 Ohio St. 489, 508, 140 N.E. 410, 416.

{¶ 21} Thus, like its predecessor, the Miller Act focuses upon protecting existing utility customers from having their service terminated without commission approval. This protection extends to situations where the utility franchise contract has expired (*Lake Shore Elec. Ry. Co. v. State ex rel. Martin* [1932], 125 Ohio St. 81, 180 N.E. 540) and where the service was provided without any franchise contract (*State ex rel. Wear, supra*, 128 Ohio St. 95, 190 N.E. 224).

{¶ 22} The operative portion of the Miller Act provides that:

"[N]o public utility * * * furnishing service or facilities within this state, shall * * * *be required to abandon or withdraw any main track or depot of a railroad, or main pipe line, gas line, telegraph line, telephone toll line, electric light line, or any portion thereof, * * * or the service rendered thereby*," without commission approval. (Emphasis added.) R.C. 4905.20.

{¶ 23} This language is subject to two reasonable, but conflicting, interpretations. The Act can be interpreted to apply either to the forced or voluntary abandonment of (1) any "main pipe line," "main gas line," "main electric line," etc., or the service rendered thereby, or (2) not only "main track" or "main pipe line," but also *any* gas line, telegraph line, or electric line, etc., or the service rendered thereby.

8

**{¶ 24}** When a statute is susceptible of more than one interpretation, courts seek to interpret the statutory provision in a manner that most readily furthers the legislative purpose as reflected in the wording used in the legislation. *United Tel. Co. v. Limbach* (1994), 71 Ohio St.3d 369, 372, 643 N.E.2d 1129, 1131; *Harris v. Van Hoose* (1990), 49 Ohio St. 3d 24, 26, 550 N.E.2d 461, 462. Courts review several factors in order to glean the General Assembly's intent, including the circumstances surrounding the legislative enactment, the history of the statute, the spirit of the statute (the ultimate results intended by adherence to the statutory scheme), and the public policy that induced the statute's enactment. R.C. 1.49.

**{¶ 25}** Several of these factors are relevant to the case at bar. As reflected above, the Gilmore Act and the Miller Act were specifically enacted and have been used to protect existing utility facilities, utility consumers, and their utility providers from the forced termination of utility services or the removal of nonmunicipal utility facilities without commission approval. *E. Ohio Gas Co., supra,* 106 Ohio St. 489, 140 N.E. 410; *State ex rel. Klapp, supra,* 10 Ohio St.2d 14, 39 O.O.2d 9, 225 N.E.2d 230; *State ex rel. Wear, supra,* 128 Ohio St. 95, 190 N.E. 224. For the reasons that follow, we interpret the Miller Act to apply to the abandonment or withdrawal of any electric line, regardless of size, or the service rendered thereby.

**{¶ 26}** The interpretation of the Miller Act as limited to main electric lines applies to the electric industry our holding that the Miller Act applies only to "main" railroad tracks but not to "spur" or "side" rail track. *Toledo, supra,* 135 Ohio St. at 61-62, 13 O.O. at 331, 19 N.E.2d at 164. However, we find that *Toledo* is factually distinguishable from the case at bar.

**{¶ 27}** In *Toledo*, we reviewed the General Assembly's specific preenactment wording changes in the Miller Act, in which the phrase "side track, spurs or other track" was deleted from the Act and the phrase "main track or tracks" was inserted in its place. In light of these changes, we determined that the Miller

Act applied only to "main" track, but not to "spur" or "side" railroad tracks. *Id*. There were no similar language changes regarding the "electric line" portions of the Miller Act. Thus, our interpretation of the Miller Act in *Toledo* may properly be limited to the railroad industry and is distinguishable from the case at bar.

{¶ 28} This interpretation is also arguably consistent with our quotation of the Miller Act in *State ex rel. Klapp,* wherein we stated that:

"Section 4905.20 reads:

" 'No * * * public utility as defined in Section 4905.02 of the Revised Code furnishing service or facilities in this state, shall abandon or be required to abandon or withdraw any *main * * * electric light line * * ** or any portion thereof * * *.' " (Ellipses *sic*; emphasis added.) 10 Ohio St.2d at 15, 39 O.O.2d at 10, 225 N.E.2d at 232.

{¶ 29} Our quotation of the statute with these ellipses indicated that the word "main" did apply to the phrase "electric light line." Nevertheless, notwithstanding this parsing of the statute, we held that the Miller Act required commission approval before the city of Piqua could force the Dayton Power & Light Company to abandon service and withdraw all of its facilities from the city of Piqua, including the small, customer-specific service lines like the ones at bar. Thus, irrespective of how we may have quoted the Miller Act, we applied the Act to require commission approval of the withdrawal of all lines and facilities from inside Piqua, regardless of size. *Id*.

{¶ 30} Additionally, we find the limitation of the Miller Act to main electric lines unwise from a policy perspective. This interpretation is ripe for abuse by municipalities. A municipality could manipulate the Miller Act and systematically exclude a public utility from serving selected customers, or even an entire service area, without commission oversight. This situation is inconsistent with the Miller Act's focus of protecting existing utility facilities and services to existing customers.

{¶ 31} Additionally, the terms "main," "spur," and "side" have no meaning in the electric industry. The electric industry calls high-voltage lines (69,000 volts or greater) "transmission lines," and customer-specific lines "service lines" or "distribution lines." See R.C. 4933.81(C). Therefore, interpreting the Miller Act to apply only to "main" electric lines may well create confusion in the electric industry. Therefore, we find that the General Assembly's intent to protect consumers is best promoted by interpreting the Miller Act to apply to the abandonment or withdrawal of services from any electric line, including individual-customer-service lines like the ones at bar. This interpretation maximizes consumer protection and reduces the opportunities for abuse by requiring commission oversight and review over the abandonment of any electric line, regardless of size.

{¶ 32} Toledo correctly argues that enforcing Section 3 of Ordinance 1995-01 would terminate Toledo's service to a facility simply because that facility has a new occupant. Toledo's existing electric lines do not become unprotected by the Miller Act merely because the name on the bill changes. Termination of the current utility/customer relationship does not alter the fact that the service line itself is protected by the Act. Accordingly, we find that Section 3 of Clyde Ordinance 1995-01 violates the Miller Act to the extent that it requires Toledo to stop service over its existing electric lines to facilities inside Clyde's city limits without commission approval.

{¶ 33} However, Toledo incorrectly argues that in addition to protecting its existing electric lines and service, the Miller Act gives Toledo the right to serve new facilities and customers not yet in existence. We find that this argument lacks merit.

{¶ 34} The Act protects only existing facilities and the service rendered thereby. The General Assembly incorporated this protection into the Miller Act by providing that "no public utility * * * *furnishing service* * * * shall * * * be required to abandon or withdraw any * * * electric light line" without commission

approval. (Emphasis added.) R.C. 4905.20. This same perspective is also reflected in R.C. 4905.21, which provides that "[t]his section applies to all *service now rendered * * *.*" (Emphasis added.) Thus, the Miller Act protects not only the utility provider's electric lines, but also the provider's right to continue "furnishing service" over those lines to its current customers. See, *e.g., State ex rel. Klapp, supra,* 10 Ohio St.2d 14, 39 O.O.2d 9, 225 N.E.2d 230.

{¶ 35} This language does not create in a utility the right to expand its customer base, after its franchise expires, to serve unknown future facilities and customers inside a city that has not only created its own municipal utility but also declared an intent to serve all new facilities and customers. Simply stated, the Miller Act protects the nexus between the utility provider and its existing facilities or load centers, binding them together in such a manner that only the commission can compel termination of that relationship. New facilities or load centers have no nexus to the public utility; their only relationship is with the municipality. First, these new facilities are hypothetical and may never be realized. Second, no nexus between the public utility and the new facilities preceded creation of the municipal utility, so there is nothing for the Miller Act to protect.

{¶ 36} Finding otherwise would mean that once a municipality entered into a franchise arrangement with a public utility to provide utility services to municipal inhabitants, the municipality could terminate that arrangement only with commission approval. This position is inconsistent with the intent behind Section 4, Article XVIII of the Ohio Constitution and with the concept that "municipalities have the exclusive power to contract for public utility services. This exclusive power necessarily presumes that while being able to grant public utility franchises, a municipality may likewise exclude a public utility from serving its inhabitants." *Lucas, supra,* 2 Ohio St.3d at 16, 2 OBR at 504, 442 N.E.2d at 452.

{¶ 37} In *Lucas*, the village of Lucas provided electric power to all of the village inhabitants, including the Lucas Local School District. The school board

resolved to buy its electric power from a different source. The village then obtained an injunction to prevent the school board from purchasing power from anyone other than the village. The court of appeals in *Lucas* affirmed.

{¶ 38} We agreed with the trial court and the court of appeals, stating that "contracting for public utility services is exclusively a municipal function under Section 4, Article XVIII, of the Ohio Constitution." *Lucas, supra*, 2 Ohio St.3d at 15, 2 OBR at 503, 442 N.E.2d at 451. We then applied the "substantial interference" test set forth in *Columbus v. Teater, supra*, 53 Ohio St.2d 253, 7 O.O.3d 410, 374 N.E.2d 154, and held that permitting the school board to contract separately for electric service would circumvent the village's right to require a franchise to serve its inhabitants and would substantially interfere with the village's constitutional power to control the public utilities which serve the village's inhabitants. *Id*. at 15-16, 2 OBR at 503, 442 N.E.2d at 451-452.

{¶ 39} Thus, the question at bar becomes whether the expansion of Toledo's service territory inside Clyde after the franchise has expired and Clyde has declared its intent to serve its inhabitants amounts to a substantial interference with Clyde's constitutional right to require a franchise to serve its inhabitants. We find that it does.

{¶ 40} Municipalities' power to control operation of utilities within their municipal boundaries is also reflected in the Certified Territory Act, R.C. 4933.81 to 4933.90. R.C. 4933.83(A) and 4933.87. See, also, Legislative Service Commission Analysis of 1978 H.B. No. 577 (as passed by the House) at 3. Perhaps the best example of the General Assembly's recognition of municipal utility exclusivity appears in R.C. 4933.83(A):

*"Except as otherwise provided in this section and Article XVIII of the Ohio Constitution*, each electric supplier shall have the exclusive right to furnish electric service to all electric load centers located presently or in the future within its certified territory, * * * provided that *nothing in [the Certified Territory Act] shall*

*impair the power of municipal corporations to require franchises or contracts for the provision of electric service within their boundaries * * *.*"  (Emphasis added.)

{¶ 41} Thus, while electric suppliers like Toledo have the "exclusive right" to furnish electricity to the current and future customers inside their service territories, this right is expressly limited by Clyde's right to require a franchise contract to serve its inhabitants.

{¶ 42} The right to require a contract necessarily also means the ability to exclude competitors of a municipal utility.  Permitting competition inside the municipal utility boundaries would be inconsistent with a municipality's right to require a contract to serve the municipal inhabitants.  Therefore, absent a franchise or contract with a municipality giving a public utility the right to serve the municipal inhabitants, that public utility has no right to serve those customers within its service territory that are located within a municipality with a Section 4, Article XVIII utility.  Accordingly, a municipality may exclude another energy provider, including the local public utility, from attempting to provide utility service inside the municipal boundaries.

{¶ 43} Here, Clyde created a municipal utility and exercised its power to exclude Toledo from serving new, future utility facilities inside Clyde's city limits.  At the same time, Clyde sought commission approval to terminate Toledo's existing customer relationships and to remove its facilities from inside Clyde under the Miller Act.  As to these new facilities, Clyde did all that was required of it under the Miller Act.

{¶ 44} Once Toledo's franchise with Clyde expired, Toledo was an occupant at sufferance inside Clyde's city limits.  *State ex rel. Klapp v. Dayton Power & Light Co*. (S.D. Ohio 1957), 170 F. Supp. 722, 725, affirmed, 263 F.2d 909 (C.A. 6, 1959), reversed on other grounds (1959), 359 U.S. 552, 79 S.Ct. 115, 3 L.Ed.2d 1035.

{¶ 45} "Mere acquiescence in the continued unauthorized occupancy of the streets, or nonaction on the part of public officials to prevent obstruction, or delay in bringing action to procure an order of ouster, could not serve to confer any right upon the defendant [utility] company or estop the city from maintaining this proceeding [for ouster]." *Ohio Elec. Power Co. v. State ex rel. Martin* (1929), 121 Ohio St. 235, 240, 167 N.E. 877, 878.

{¶ 46} Toledo also argues that, since it has an affirmative duty under R.C. 4905.22 and 4933.83 to serve the current and future electric needs in its service territory, the Miller Act protects Toledo's interest in future customers as well as existing customers. We find that this argument is without merit.

{¶ 47} The Certified Territory Act does not support this proposition. The Certified Territory Act expressly exempts home rule municipalities from that Act:

"[N]othing in [the Certified Territory Act] shall impair the power of municipal corporations to require franchises or contracts for the provision of electric services within their boundaries." R.C. 4933.83(A).

{¶ 48} Therefore, unless a public utility has a franchise giving it the right to serve the municipal inhabitants, that public utility has no right to serve customers within its service territory that are located within a municipality that is operating a Section 4, Article XVIII utility and declared an intention to serve such customers. R.C. 4933.87(A).

{¶ 49} In this case, Toledo's franchise with Clyde expired in 1990, and Clyde has refused to enter into another franchise with Toledo. Thus, Toledo has no right under the Certified Territory Act to serve any Clyde inhabitant or structure other than those it was serving before Clyde created its own utility and declared an intent to serve all new customers and facilities inside its city limits.

{¶ 50} Toledo relies upon several cases as support for its argument that, absent commission approval, it has the right to serve future customers inside Clyde's city limits. *Lake Shore Elec. Ry. Co., supra*, 125 Ohio St. 81, 180 N.E.

540; *Indus. Gas Co. v. Pub. Util. Comm.* (1939), 135 Ohio St. 408, 14 O.O. 290, 21 N.E.2d 166; *State ex rel. Klapp*, *supra*, 10 Ohio St.2d 14, 39 O.O.2d 9, 225 N.E.2d 230; *State ex rel. Wear, supra,* 128 Ohio St. 95, 190 N.E. 224. None of these cases stand for the proposition espoused by Toledo.

{¶ 51} Although we held in *Wear, Lake Shore Elec. Ry. Co.* and *Klapp* that the Miller Act prevailed over a city's right to oust a public utility or prevent it from providing service inside its city limits, these cases do not control the situation at bar. These cases all involved situations involving termination of existing services to current customers. None asked this court to consider whether, as here, a utility's right to serve unknown future customers inside a city that has created its own utility and declared its intent to serve all new customers with the city's utility was protected by the Act.

{¶ 52} In *Wear*, the city of Springfield sought to stop the Cincinnati & Lake Erie Railroad Company from providing passenger rail service through Springfield. Springfield had no franchise or contract with the railroad. We looked upon the public's interest in continued service and the statewide disruption that would occur if termination were permitted, and held that the Miller Act required commission approval before Springfield could require the railroad to terminate the service. A similar result was reached in *Lake Shore Elec. Ry. Co.* The city of Bellevue sought to oust the Lake Shore Electric Railway Company from providing passenger rail service to and through Bellevue. We held that the Miller Act prevented the city from terminating the rail service without commission approval. Neither *Wear* nor *Lake Shore Elec. Ry. Co.* stands for the proposition that a utility can expand its reach within a city to new customers after the city has created its own utility and declared an intent to serve all new customers with the city's utility.

{¶ 53} In *Klapp*, the city of Piqua sought to stop the Dayton Power & Light Company from providing electric service to Piqua and to compel it to withdraw its equipment and facilities from within Piqua's city limits. Piqua had a municipal

utility and intended to serve all of its inhabitants. Piqua asserted its constitutional authority under Sections 3 and 4, Article XVIII for ousting Dayton Power & Light without commission approval. We held that the proposed ouster was subject to commission approval under the Miller Act. As reflected in the court of appeals' opinion in an earlier phase of the underlying action, "it is obvious that Piqua may operate its own utility. But this fact has no bearing upon the issue involved herein. We are concerned with pre-existing facilities and services furnished to the inhabitants of Piqua by a foreign utility." *State ex rel. Klapp* v. *Dayton Power & Light Co.* (1960), 113 Ohio App. 433, 438, 178 N.E.2d 838, 842. In contrast, the question now before us relates to services for new, prospective Clyde inhabitants and facilities. Thus, *Klapp* provides no support for Toledo's claimed right to serve new customers and structures in this case.

{¶ 54} In *Indus. Gas Co.*, the Industrial Gas Company sought commission permission to change the structure of its company and withdraw service from some of its customers, but continue to serve other, higher-profit-margin customers in the same area on a contract basis. The commission denied the company's application to selectively withdraw service. We agreed, stating that a public utility must serve all of the customers within its service territory. Utilities cannot selectively pick out the best customers to serve and then refuse to serve the remaining customers in its service territory. 135 Ohio St. 408, 14 O.O. 290, 21 N.E.2d 166, paragraph two of the syllabus. Here, Toledo is not preserving service to its current customers, but trying to obtain new customers under the aegis of the Miller Act. *Indus. Gas Co.* does not stand for the position espoused by Toledo. Once Toledo's franchise expired and Clyde declared its intent to serve all new Clyde customers, Toledo was prohibited from initiating new service relationships inside Clyde's municipal utility boundaries. With the exception of Toledo's pre-1995 customers and facilities, Clyde had the exclusive right to provide utility service to its inhabitants after the franchise expired. Accord R.C. 4933.03 (municipal consent required to supply

electricity inside the municipality); 4933.16 (municipal consent required to maintain electric distribution facilities inside city limits); 4933.83(A) (municipal corporation may require franchise or contract to serve customers within city limits); 4933.87. Accordingly, we hold that the requirement that all new facilities will be customers of Clyde's utility department contained in Section 3 of Clyde Ordinance 1995-01 does not violate the Miller Act. Toledo's second proposition of law contends that Clyde's ordinance amounts to an unconstitutional deprivation of property without due process of law. We find that this argument is not properly before us because it was not decided by the court of appeals and is outside the single issue that the parties agreed by stipulation to present to the court of appeals below. Toledo's second proposition of law is without merit.

{¶ 55} For the reasons set forth above, we find that the court of appeals incorrectly interpreted the Miller Act. Accordingly, the judgment of the court of appeals is reversed in part and affirmed in part. We order Clyde to seek approval from the Public Utilities Commission before taking any action to terminate Toledo Edison's service to facilities that Toledo Edison served before the effective date of Ordinance 1995-01.

*Judgment reversed in part*
*and affirmed in part*,
*and writ granted.*

MOYER, C.J., F.E. SWEENEY, PFEIFER, COOK and STRATTON, JJ., concur.

DOUGLAS and RESNICK, JJ., not participating.

_____