[This opinion has been published in *Ohio Official Reports* at 77 Ohio St.3d 102.]

VILLAGE OF GRAFTON, APPELLEE, *v*. OHIO EDISON COMPANY ET AL.,
APPELLANTS.

[Cite as *Grafton v. Ohio Edison Co.*, 1996-Ohio-336.]

*Municipal corporations—Public utilities—Interrelationship between the Miller Act, R.C. 4905.20 and 4905.21, the Certified Territory Act, R.C. 4933.81 through 4933.90, and a municipality's power to control utilities within municipal limits, Section 4, Article XVIII of the Ohio Constitution.*

(No. 95-572—Submitted May 1, 1996—Decided November 13, 1996.)

APPEAL from the Court of Appeals for Lorain County, No. 94CA5877.

———————————

{¶ 1} On May 1, 1962, the village of Grafton granted the Ohio Edison Company a twenty-five-year, nonexclusive franchise to provide electric service to two commercial/industrial customers inside Grafton and to transport electrical energy through Grafton for use outside Grafton:

"Section 1.    Ohio Edison Company * * * is hereby granted, for a period of twenty-five (25) years from the date of the filing of its acceptance hereof * * * the right and privilege to erect, construct, operate and maintain electric facilities, including without limitation poles * * * and all necessary fixtures and appurtenances, in, along, [and] over * * * the streets, alleys, public ways and grounds of the Village of Grafton.

"Section 2.    *Ohio Edison Company may exercise the rights granted in Section 1* of this Ordinance *only to the extent reasonably necessary for the purpose of transmitting electric energy through the Village from points outside the corporate limits of the Village to other points outside said corporate limits, and for the purpose of supplying electrical energy to Sunshine Biscuits, Inc. Milling Division and W.O. Larson Foundry Co., or their successors and assigns.*

"* * *

"Section 6.    It is understood and agreed that the *rights and privileges granted herein shall not be or be considered an exclusive grant* and nothing in this ordinance shall in any way affect, restrict or abridge the rights of the Village of Grafton, at any time, to grant similar rights and privileges to any other person." (Emphasis added.)

{¶ 2} In 1947, Grafton had granted Ohio Edison's predecessor in interest a fifteen-year franchise to maintain and operate an existing system for the transmission and distribution of electrical power, and to extend service to three specified customers.[1] These franchise agreements expired by their own terms in 1962 and 1987. Ohio Edison did not seek to renew its limited franchises.

{¶ 3} Grafton provides electric service to its inhabitants through its own electric department. Following expiration of the franchises, Ohio Edison still serves customers that it had served under the franchises, but has also initiated service to two newly developed commercial properties, those of Design Management Company ("Design") in 1992 and Rite Aid of Ohio, Inc. ("Rite Aid") in 1993. Design and Rite Aid were not part of the limited franchises. Ohio Edison ran separate service lines (including step-down transformers and other equipment) to Design and to Rite Aid from an existing Ohio Edison transmission line running within the Design and the Rite Aid properties. The service lines to Design and Rite Aid do not cross Grafton's public lands or rights-of-way. Grafton has electric poles and lines capable of serving Design and Rite Aid on or near both properties.

---

1. On December 28, 1939, in Grafton Ordinance No. 320, Grafton granted the Marion-Reserve Power Company the right to maintain and operate a transmission and distribution system in Grafton for the sale, transmission, and distribution of electrical energy. On April 22, 1947, Grafton repealed Ordinance No. 320 and enacted Ordinance No. 410. Ordinance No. 410 granted the Ohio Public Service Company the right to maintain the existing Marion-Reserve Power Company distribution and transmission system within Grafton's boundaries and the right to serve three specified customers. Ordinance No. 410 expired in 1962.

**{¶ 4}** In 1992, Grafton brought an action for injunctive and declaratory relief and damages in the common pleas court relating to Ohio Edison's construction of the new service lines and provision of electric service to Design and Rite Aid. Ohio Edison filed a counterclaim against Grafton for tortious interference with business relations. Grafton, Ohio Edison, Rite Aid, and Design each moved for summary judgment on the various claims and the counterclaims.

**{¶ 5}** The trial court found that Grafton could compel Ohio Edison to stop serving Design and Rite Aid because Ohio Edison had commenced service to these two customers after the expiration of the franchise agreement. The trial court noted that Grafton would be required to seek permission from the Public Utilities Commission of Ohio to terminate Ohio Edison's service to its pre-1987 customers, but held that Grafton need not make such an application in this case because Grafton was merely exercising its municipal utility authority under Section 4, Article XVIII of the Ohio Constitution.

**{¶ 6}** As to its declaratory judgment, the court determined that there was no just reason for delay. Ohio Edison and Design appealed, arguing that Grafton could not stop Ohio Edison's continued service to any of its customers, irrespective of when they began receiving that service, without first obtaining commission permission under the Miller Act. The court of appeals disagreed, holding that the Miller Act did not apply in this case.

**{¶ 7}** The court of appeals based its decision on *Toledo v. Pub. Util. Comm.* (1939), 135 Ohio St. 57, 62, 13 O.O. 329, 331, 19 N.E.2d 162, 164, in which this court held that the Miller Act did not create commission jurisdiction over the forced abandonment of a railroad "spur" or "side" track. The track at issue in *Toledo* served only nine individual customers. In *Grafton*, the court of appeals reasoned that, since the electric line at issue served only two customers, it was the equivalent of a "spur" or "side" track. Further, the court of appeals held that, since the Miller

Act did not apply in the instant case, Grafton need not apply to the commission before compelling Ohio Edison to terminate service to Design and Rite Aid.

{¶ 8} The cause is now before this court upon the allowance of a motion to certify the record.

---

*Corso & Lillie Co., L.P.A.,* and *Richard G. Lillie*, for appellee.

*Jones, Day, Reavis & Pogue* and *David A. Kutik*; *Cook & Batista Co., L.P.A.,* and *Daniel P. Batista*, for appellants.

*Chester, Willcox, & Saxbe, John W. Bentine* and *Jeffrey L. Small*, urging affirmance for *amicus curiae* American Municipal Power - Ohio.

*Robert S. Tongren,* Consumers' Counsel*,* and *Barry Cohen*, Assistant Consumers' Counsel, urging reversal for *amicus curiae* Office of Consumers' Counsel.

*Porter, Wright, Morris & Arthur, Samuel H. Porter, Alan D. Wright, Kathleen M. Trafford, Daniel R. Conway* and *Alaine Y. Miller*, urging reversal for *amicus curiae* Ohio Electric Utility Institute.

*Betty D. Montgomery*, Attorney General, *Duane W. Luckey* and *Ann E. Henkener*, Assistant Attorneys General, urging reversal for *amicus curiae* Public Utilities Commission of Ohio.

---

*Per Curiam.*

{¶ 9} Appellants pose three propositions of law, arguing that the Miller Act prevents Grafton from terminating Ohio Edison's service to Design and Rite Aid without commission approval. For the reasons that follow, we hold that the Miller Act does not prevent Grafton from forcing Ohio Edison to abandon the Design and Rite Aid electric lines.

{¶ 10} In order to obtain summary judgment, the movant must show that (1) there is no genuine issue of material fact; (2) the moving party is entitled to

4

judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion when viewing evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party. *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.* (1994), 69 Ohio St.3d 217, 219, 631 N.E.2d 150, 152. This court has complete and independent power of review as to all questions of law. *MCI Telecommunications Corp. v. Pub. Util. Comm.* (1988), 38 Ohio St.3d 266, 268, 527 N.E.2d 777, 780; *Indus. Energy Consumers of Ohio Power Co. v. Pub. Util. Comm.* (1994), 68 Ohio St.3d 559, 563, 629 N.E.2d 423, 426. There are no questions of fact in the case now before us, as Ohio Edison acknowledges that it erected the service lines to Design and Rite Aid several years after its nonexclusive franchise with Grafton had expired. Thus, the determination of whether the trial court properly granted summary judgment below involves only questions of law and is considered on a *de novo* basis. *Id.*

{¶ 11} This case involves the interrelationship between the Miller Act, R.C. 4905.20 and 4905.21; the Certified Territory Act, R.C. 4933.81 through 4933.90; and a municipality's power to control utilities within its municipal limits, Section 4, Article XVIII of the Ohio Constitution.

{¶ 12} Under Section 4, Article XVIII of the Ohio Constitution, Grafton had constitutional authority to build and operate a municipal utility to serve its inhabitants. *Wooster v. Graines* (1990), 52 Ohio St.3d 180, 181, 556 N.E.2d 1163, 1164. This right is not generally subject to statutory restriction. *Lucas v. Lucas Local School Dist.* (1982), 2 Ohio St.3d 13, 2 OBR 501, 442 N.E.2d 449; *Columbus v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 427, 12 O.O.3d 361, 390 N.E.2d 1201; *Columbus v. Ohio Power Siting Comm.* (1979), 58 Ohio St.2d 435, 12 O.O.3d 365, 390 N.E.2d 1208.

{¶ 13} However, municipal utility operations are subject to statewide police power limitations for health and safety reasons. See *Canton v. Whitman* (1975), 44 Ohio St.2d 62, 73 O.O.2d 285, 337 N.E.2d 766; *Delaware Cty. Bd. of Commrs. v.*

*Columbus* (1986), 26 Ohio St.3d 179, 184, 26 OBR 154, 158-159, 497 N.E.2d 1112, 1117; *Columbus v. Teater* (1978), 53 Ohio St.2d 253, 260-261, 7 O.O.3d 410, 414, 374 N.E.2d 154, 159. Moreover, the Miller Act requires municipalities to obtain commission approval before forcing the abandonment of nonmunicipal utility facilities or the withdrawal of nonmunicipal utility services located inside the municipality. *State ex rel. Klapp v. Dayton Power & Light Co.* (1967), 10 Ohio St.2d 14, 39 O.O.2d 9, 225 N.E.2d 230; *State ex rel. Wear v. Cincinnati & Lake Erie RR. Co.* (1934), 128 Ohio St. 95, 190 N.E. 224. Thus, under the Miller Act, a municipality generally must seek commission approval before forcing a utility to stop serving customers or to abandon its electric lines inside the municipal limits. *Id.*

{¶ 14} However, Grafton asserts that the Miller Act does not apply in this case because the Design and Rite Aid service lines are service lines for individual customers and not a "main" electric line and because Ohio Edison improperly initiated service to Design and Rite Aid after expiration of the nonexclusive franchise. Grafton is correct only on the second ground. We discussed Grafton's first issue in detail in *State ex rel. Toledo Edison v. Clyde* (1996), 76 Ohio St.3d 508, 668 N.E.2d 498, holding that the Miller Act applies to the forced abandonment of or withdrawal of service over all electric lines, regardless of size. However, for the reasons set forth below, we find that the Miller Act does not apply in this case because Ohio Edison wrongfully initiated service to Design and Rite Aid.

{¶ 15} The Miller Act focuses upon protecting existing utility customers from having their service terminated without commission approval. *E. Ohio Gas Co. v. Cleveland* (1922), 106 Ohio St. 489, 508-509, 140 N.E. 410, 416. This protection extends to situations where the utility franchise has expired (*Lake Shore Elec. Ry. Co. v. State ex rel. Martin* [1932], 125 Ohio St. 81, 180 N.E. 540) and even where the service was provided without any franchise contract (*Wear, supra*, 128 Ohio St. 95, 190 N.E. 224). However, the Miller Act does not create any right

6

in a public utility to expand its customer base after its franchise expires to serve unknown, future customers inside a municipality that has created and is operating its own municipal utility. *State ex rel. Toledo Edison, supra*, 76 Ohio St.3d at 517, 668 N.E.2d at ___.

{¶ 16} Grafton argues that Ohio Edison's extension of service to Design and Rite Aid was wrongful and violated Grafton's exclusive right to provide utility service to its inhabitants. Grafton is correct.

{¶ 17} Ohio Edison was never granted a village-wide franchise to serve Grafton's inhabitants. From their inception, Ohio Edison's franchises were limited to maintaining a transmission and distribution system within Grafton, to serving only specific customers (or their successors and assigns), and to transporting electricity through Grafton for use solely outside Grafton. Thus, Ohio Edison had no right *under its franchises* to extend service to additional customers inside Grafton's municipal limits, including service to Design or Rite Aid.

{¶ 18} Moreover, Grafton had the right to create a municipal utility monopoly inside Grafton and exclude Ohio Edison from serving Grafton's inhabitants. See *State ex rel. Toledo Edison, supra,* 76 Ohio St.3d at 517, 668 N.E.2d at ___. This position stems from an exclusive grant of power to municipalities in Section 4, Article XVIII of the Ohio Constitution. *Id.* at 516, 668 N.E.2d at ___, citing *Lucas, supra,* 2 Ohio St.3d at 16, 2 OBR at 504, 442 N.E.2d at 452. This exclusive power is also recognized in the Certified Territory Act. R.C. 4933.83(A) and 4933.87. Thus, while Ohio Edison has the "exclusive right" to furnish electricity to the current and future customers inside its service territory, this right is expressly limited by Grafton's right to require a franchise contract to serve its inhabitants. R.C. 4933.83(A) and 4933.87. See Legislative Service Analysis of 1977 Am. H.B. No. 577, at 3.

{¶ 19} Ohio Edison's franchises expired in 1962 and 1987. Thus, Ohio Edison never had a right to serve any of Grafton's inhabitants other than those

specified in these franchises. Ohio Edison never sought to renew or expand the scope of its Grafton franchises, and Grafton took no affirmative steps to prevent Ohio Edison from doing so. However, Grafton was not required to do so. The limited reach of the original franchises made it clear that service to any additional or new customers was beyond the scope of those franchises and wrongful. Additionally, during this entire time frame Grafton was serving its inhabitants with its own utility. That there had been narrowly drawn franchises does not prevent Grafton from stopping Ohio Edison from providing service to customers that Grafton never intended Ohio Edison to serve.[2]

{¶ 20} Ohio Edison was an occupant at sufferance inside Grafton's municipal limits once the franchise contract expired. *State ex rel. Klapp v. Dayton Power & Light Co.* (S.D. Ohio 1957), 170 F. Supp. 722, 725, affirmed in (C.A.6 1959), 263 F.2d 909, reversed on other grounds (1959), 359 U.S. 552, 79 S.Ct. 115, 3 L.Ed.2d 1035. "Mere acquiescence in the continued unauthorized occupancy of the streets, or non-action on the part of public officials to prevent obstruction, or delay in bringing action to procure an order of ouster, could not serve to confer any right upon the defendant company or estop the city from maintaining this proceeding [for ouster]." *Ohio Elec. Power Co. v. State ex rel. Martin* (1929), 121 Ohio St. 235, 240, 167 N.E. 877, 878.

{¶ 21} Thus, although Ohio Edison's right to continue serving customers that it served under its franchises is secure under the Miller Act, Ohio Edison's right to serve new customers inside Grafton's municipal boundaries certainly would not

---

2. The dissent states that other Grafton customers which were not mentioned in the Grafton franchises are also currently being served by Ohio Edison, and suggests that estoppel may be appropriate in this case. The dissent is mistaken. "Mere acquiescence in the continued unauthorized occupancy of the streets, or non-action on the part of public officials to prevent obstruction, or *delay in bringing action to procure an order of ouster, could not serve to confer any right upon the defendant company or estop the city from maintaining this proceeding [for ouster]*." (Emphasis added.) *Ohio Elec. Power Co. v. State ex rel. Martin* (1929), 121 Ohio St. 235, 240, 167 N.E. 877, 878.

grow merely because Grafton took no affirmative steps to prevent such an expansion. In *State ex rel. Toledo Edison, supra*, 76 Ohio St.3d 508, 668 N.E.2d 498, we held that expansion of Toledo Edison's customer base after expiration of a franchise was protected under the Miller Act until Clyde took affirmative action, by ordinance, to assert its right to control utility services. But Toledo Edison had had a franchise to serve all of Clyde's inhabitants. By contrast, the expiration of narrowly drawn, specified-customer franchises, like the ones at bar, does not confer more rights on Ohio Edison than it had under the original franchises.[3] Ohio Edison cannot intend to argue that the expiration of these franchises somehow imbued it with rights to expand its service territory and serve new customers inside Grafton's municipal limits that are superior to Grafton's right to serve its citizens.

{¶ 22} Ohio Edison argues that it was required to provide service to Design and Rite Aid under the Certified Territory Act and R.C. 4905.22 after they requested service from Ohio Edison. This argument is without merit.

{¶ 23} The Certified Territory Act expressly provides that Ohio Edison had no right to serve any customer inside Grafton's municipal limits without Grafton's consent:

*"Except as otherwise provided in this section and Article XVIII of the Ohio Constitution*, each electric supplier shall have the exclusive right to furnish electric service to all electric load centers located presently or in the future within its certified territory, * * * provided that *nothing in [the Certified Territory Act] shall impair the power of municipal corporations to require franchises or contracts for*

---

3. The dissent suggests that Ohio Edison should be permitted to expand its utility services inside Grafton not only to Rite Aid and Design, but also to any other customer as long as Ohio Edison does not cross one of Grafton's rights-of-way in providing the service. This position grants Ohio Edison significantly more authority than it had under the franchises and essentially eliminates Grafton's constitutional right to require a utility to enter into a contract with Grafton before providing utility service to Grafton's inhabitants.

*the provision of electric service within their boundaries * * *.*" (Emphasis added.) R.C. 4933.83(A).

{¶ 24} Ohio Edison knew that its franchises permitted service only to the individual customers identified in the franchises. Design and Rite Aid are not the customers named in the franchises. Nor did Ohio Edison seek or obtain Grafton's consent to provide service to Design or Rite Aid. Under these circumstances, erection of the two service lines in question was not permitted under the franchises or the Certified Territory Act and was improper.

{¶ 25} Ohio Edison asserts that, irrespective of how the Design and Rite Aid service lines came into being, abandonment of the lines or termination of the service over those lines requires commission approval. Thus, Ohio Edison poses the question of whether forcing the abandonment of two electric lines erected in violation of Grafton's constitutional right to control the provision of electric services to its inhabitants requires commission approval. We find that it does not.

{¶ 26} The Miller Act applies to the forced abandonment of any electric line or the service over that line. *State ex rel. Toledo Edison, supra*, 76 Ohio St.3d at 515, 668 N.E.2d at ___; R.C. 4905.20 and 4905.21. Yet a public utility should not be permitted knowingly to overreach the express terms of its franchise agreements to expand its service territory. Nor should a public utility be allowed to knowingly violate a municipality's right to exclusive control of utility services within the municipality, and then assert the protections of the Miller Act to prevent forced abandonment of the improperly erected service line or termination of the wrongfully instituted service. The Miller Act was enacted to protect consumers from having their service terminated because of the whims of a public utility or rogue municipality. The Act was not created to protect overreaching public utilities from abandonment proceedings by aggrieved municipalities. Under circumstances like the ones presently before us, we decline the opportunity to permit the protections of the Miller Act to be distorted into a weapon against municipalities.

**{¶ 27}** This policy is also reflected in R.C. 4933.16, which permits a municipality to use remedies in addition to those set forth in R.C. 4933.99, including injunction, to remedy violations of R.C. 4933.03, 4933.13, 4933.16, which prohibit placement of property of utilities within public rights-of-way without the consent of the municipality. Although not directly applicable to the case at bar, the policy articulated in R.C. 4933.16 reflects that under certain circumstances, the Miller Act may not be the exclusive remedy for the forced abandonment of an electric line.

**{¶ 28}** We, therefore, hold that under the circumstances presently before us, the Miller Act does not apply and, therefore, that Grafton need not seek commission approval in order to force Ohio Edison to abandon the two electric service lines in question. Accordingly, for the reasons set forth above, the decision of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., F.E. SWEENEY, PFEIFER, BRYANT and STRATTON, JJ., concur.

DOUGLAS AND RESNICK, JJ., dissent.

PEGGY BRYANT, J., of the Tenth Appellate District, sitting for COOK, J.

————————————

DOUGLAS, J., dissenting.

**{¶ 29}** I am compelled to dissent because the decision of the majority and some of its language cause me great concern. I fear that the majority opinion starts this court and this state down a long and dangerous road with only disaster in sight. When that occurs, recovery will likely be expensive, time-consuming and too late for consumers who are damaged in the process.

I

**{¶ 30}** The majority makes at least three disturbing statements.

A.

{¶ 31} "Grafton argues that Ohio Edison's extension of service to Design and Rite Aid was wrongful and violated Grafton's *exclusive right to provide utility service to its inhabitants. Grafton is correct.*" (Emphasis added.) Thus, the majority says it agrees with Grafton that Grafton has the exclusive right as against all others to serve Grafton's inhabitants. "Exclusive" is defined as "[a]ppertaining to the subject alone, not including, admitting, or pertaining to any others. Sole. Shutting out; debarring from interference or participation; *vested in one person alone.*" (Emphasis added.) Black's Law Dictionary (6 Ed.Rev. 1990) 564. Accordingly, since Grafton has the "exclusive" right, the Miller Act never comes into play, and Ohio Edison can be ousted from Grafton without further pomp and circumstance.

{¶ 32} Can we be sure the majority really means this? Apparently so.

B.

{¶ 33} "Ohio Edison was an occupant at sufferance inside Grafton's municipal limits once the franchise contract expired." An occupant is a person in possession. "Sufferance" is defined as "[t]oleration; negative permission by not forbidding; passive consent * * *." Black's Law Dictionary (6 Ed.Rev. 1990) 1432. Thus, an occupant at sufferance is one who occupies by toleration, not being forbidden by and with the consent of another with superior rights. Accordingly, when Grafton decides to withdraw its consent, forbids, and ceases to tolerate Ohio Edison, then, without more, Ohio Edison is history in Grafton. This could be so notwithstanding the Miller Act.

C.

{¶ 34} "Nor should a public utility be allowed to knowingly *violate a municipality's right to exclusive control of utility services* within the municipality, and then assert the protections of the Miller Act to prevent forced abandonment of the improperly erected service line or termination of the wrongfully instituted

service." (Emphasis added.) If the majority's statement were limited to the two customers in question, then that would be one thing and could be dealt with accordingly. However, use of the words "exclusive control of utility services" when there is an existing investor-owned utility provider gives, once again, Grafton the right to say, "Our sufferance is at an end" and order Ohio Edison to pack its bags—as well as its poles, its lines, its transformers and its substations.

{¶ 35} This language of the majority in these three statements seems to be clear. But then we find other language.

### D.

{¶ 36} "* * * Ohio Edison's right to continue serving customers that it served under its franchises is secure under the Miller Act * * *." I agree, but how can Grafton's rights to serve its inhabitants be "exclusive," Ohio Edison be an "occupant at sufferance," Grafton have the right to "exclusive control of utility services" and Ohio Edison have any rights at all if Grafton, under our opinion, decides to summarily terminate Ohio Edison?

### II

{¶ 37} The facts of this case are simple. Ohio Edison ran service lines to Design and Rite Aid from an existing Ohio Edison transmission line. The service lines are all within private property. The lines do not cross Grafton's public lands or rights-of-way. There is no franchise permitting the lines in question nor is there any Grafton ordinance or other law prohibiting the stringing of the lines.[4] Grafton does operate a municipal utility service. Thus, the question becomes, does Ohio Edison have the right to run the lines in question and, if not, does Grafton have the

---

4. This fact alone clearly distinguishes *State ex rel. Toledo Edison Co. v. Clyde* (1996), 76 Ohio St.3d 508, 668 N.E.2d 498, a case heavily relied upon by the majority. In *Clyde*, there *was* a municipal ordinance which spelled out Clyde's intentions. In fact, the *Clyde* opinion, in discussing *Clyde's* own electric utility and *Clyde's* intention to serve all new customers, states at least seven times that Clyde had declared its intent. No such ordinance is referred to by the majority in the case now before us.

right to have the service supplied summarily terminated or must Grafton involve the PUCO pursuant to the Miller Act?

### III

{¶ 38} I believe Ohio Edison had the right to run the lines in question and establish service to Design and Rite Aid if those consumers chose to use Ohio Edison's service. While Grafton had not specifically permitted the lines to be run, neither has it prohibited such activity—even assuming, for purposes of argument, that Grafton does have such a right even on private property. But that really is not what this case is about to me.

### IV

{¶ 39} This case is about the fast-approaching issue of wheeling sales of electricity. And what the case is really about is choice. Where there is an existing investor-owned public utility and a competing municipal utility, who is going to choose what service a customer uses—the customer or the government? Today's majority gives the consumer no choice if the government wants to decide for that consumer.

{¶ 40} Up front, I concede two points. First, pursuant to Section 4, Article XVIII of the Ohio Constitution, Grafton had the authority to build and operate a municipal utility. Second, if Grafton (under the constitutional provision) chooses to make its operation a monopoly, then it has the authority to do so by acquiring Ohio Edison's plant, denying any further franchises to others, and prohibiting any person or entity from using streets and other rights-of-way in Grafton to supply electricity. But what Grafton should not be able to do is to affirmatively or constructively terminate Ohio Edison's right to serve its existing customers[5] and any new customers that can be served without traversing Grafton's rights-of-way.

---

5. The majority makes the point that under the expired franchises, Ohio Edison had the right to serve only two customers within Grafton—Sunshine Biscuits, Inc. Milling Division and W.O. Larson

**{¶ 41}** The interesting part of all of these cases is that an end result sought to be obtained by the PUCO is price reduction through competition. However, the road we are going down simply replaces one monopoly—an investor-owned utility[6]—with another monopoly owned and operated by government. This seems curious, given the order of the day which seems to be that those in charge of municipal governments want to privatize many municipal operations because the private sector can perform the service just as well or better than public employees and for less wages and fringe benefits.[7] Today, when we flip the light switch, electricity flows. Tomorrow when it does not, and the responsibility is that of a municipal utility which, incidentally, is not regulated by the PUCO and will not be a payer of tax, who will we blame?

**{¶ 42}** Fortunately, at least for now, the law is that under the provisions of the Miller Act, a utility operating within a municipality may not be ousted from the municipality without the consent of the PUCO. This is true even after the expiration

---

Founding Co. The majority says that "* * * Ohio Edison never had a right to serve any of Grafton's inhabitants other than those specified in these franchises. Ohio Edison never sought to renew or expand the scope of its Grafton franchises, and Grafton took no affirmative steps to prevent Ohio Edison from doing so." The fact is, however, that if the affidavit of Charles E. Jones is believed, Ohio Edison currently serves forty-eight customers in Grafton, not just the original two listed in the franchise agreements. Do we also have an estoppel issue?

6. It is pertinent, I believe, to note that Ohio's investor-owned electric utility companies serve nearly 4.5 million Ohio consumers, employ 23,500 Ohio workers in 2,000 communities, ensure the livelihood of 12,500 retirees, have more than 150,000 Ohio investors, provide $1.1 billion in annual taxes supporting schools and local governments, and are the largest taxpayers in fifty-one of Ohio's eighty-eight counties. Each year, they purchase more than $1.7 billion in goods and services from Ohio suppliers, contribute millions in annual economic development funding and purchase 23 million tons of Ohio coal. They have constructed 180,000 miles in transmission and distribution lines and have invested $32 billion in generating facilities. They are major contributors to various charitable, educational and civic organizations both in money and volunteer-person hours.

So there can be no question about my avoiding the issue, I once again lay on the record that two of my sons are part of the investor-owned utilities' 23,500 employees. I do not, however, own stock in these or any other businesses.

7. Attached as an appendix is a column by Lee Leonard published in the *Columbus Dispatch* on September 9, 1996. Mr. Leonard eloquently makes the point.

of a franchise agreement. *Lake Shore Elec. Ry. Co. v. State ex rel. Martin* (1932), 125 Ohio St. 81, 180 N.E. 540. Further, in *State ex rel. Klapp v. Dayton Power & Light Co.* (1967), 10 Ohio St.2d 14, 39 O.O.2d 9, 225 N.E.2d 230, we held that a municipality seeking to compel a privately owned public utility to abandon its service must apply to the PUCO even where the utility never had a valid franchise granting it the right to operate within the municipal corporation.[8]

**{¶ 43}** We should not now or ever be part of confiscation of private property without compensation whether that confiscation be actual or constructive.

IV

**{¶ 44}** There is so much more that could be and should be written in this case, but time and space do not permit. I conclude for now with just saying I respectfully dissent.

RESNICK, J., concurs in the foregoing dissenting opinion.

───────────────

8. It is interesting to note that in an attempt to respond to the major thrust of the dissent, the majority added fns. 2 and 3. Much of this ignores, as of course it must, that *no* franchise has existed since *1962*. See majority fn. 1. Rather than responding further to the majority, I will leave the opposing points of view to interested and knowledgeable readers.