DECISION.
{¶ 1} In the heart of the business district of the city of Cincinnati lies a prime piece of real estate, now in use as an open-air parking lot. Once designated as a vital part of the city's retail development plan for the revitalization of the city's downtown, the real estate changed ownership several times prior to the initiation of litigation in this case, and it is now owned by the city of Cincinnati.
 {¶ 2} In 1996, The Western and Southern Life Insurance Company ("Western Southern") initiated foreclosure proceedings against Fifth and Race Limited Partnership ("Fifth and Race") on a note in the principal amount of $9,000,000, secured by a mortgage and lien on the multi-story building formerly located on the site of the current parking lot.
 {¶ 3} The foreclosure action was resolved with a settlement agreement between Western Southern and Fifth and Race for the payment of $500,000 to Fifth and Race by Western Southern and the city of Cincinnati. The agreement referred to a collateral agreement between Western Southern and The Cincinnati Equity Fund ("CEF"), an entity whose purpose was to stimulate downtown development in the city. Under the collateral agreement, a portion of the amount to be paid to Fifth and Race would be contributed by CEF, conditioned on the occurrence of several events.
 {¶ 4} There is no dispute among the parties that, in exchange for the peaceful transfer of the property, Fifth and Race received $325,000 of a possible $500,000 from contributions made by the city of Cincinnati and Western Southern. It is the remaining $175,000 specified in the separate agreement between CEF and Western Southern that remains unpaid and is the subject of the current dispute.
 Procedural History {¶ 5} Fifth and Race initially sued the city of Cincinnati, Western Southern, and CEF on the contract. But Fifth and Race soon dismissed the city from the action.
 {¶ 6} In January 2003, a magistrate of the common pleas court granted CEF's motion for summary judgment. Following Fifth and Race's objections to the magistrate's decision, Western Southern moved for summary judgment. The trial court sustained the objections to the magistrate's decision, denied Western Southern's motion for summary judgment, and allowed the case to continue in the discovery phase.
 {¶ 7} In August 2004, CEF and Western Southern filed again for summary judgment, as did Fifth and Race. Thereafter, the trial court entered summary judgment in favor of Fifth and Race for $175,000.
 {¶ 8} Western Southern and CEF now appeal, assigning as error the trial court's entry of summary judgment in favor of Fifth and Race.
 Summary-Judgment Standard {¶ 9} We review a grant of summary judgment de novo.[1]
Fifth and Race was entitled to summary judgment only if (1) there was no genuine issue of material fact; (2) it was entitled to judgment as a matter of law; and (3) it appeared that reasonable minds could come to but one conclusion when viewing the evidence in favor of the defendants, and that conclusion was adverse to the defendants.[2]
 The "Trigger" for Payment {¶ 10} The controlling document in this case was the September 1996 settlement agreement between Western Southern and Fifth and Race. The pertinent section of this agreement, which was at the heart of the litigation, was Section E, entitled "Western Southern Further Contribution":
 {¶ 11} "The performance of this Agreement is further conditioned upon Cincinnati Equity Fund ("CEF"), on or before the Primary Closing, entering into an agreement with Western Southern in the form of that which is attached hereto as Exhibit G, or in such other form as is reasonably satisfactory to Western Southern and FR's counsel, pursuant to which CEF agrees to pay to Western Southern the sum of $175,000.00 subject to the conditions set forth therein. Upon payment by CEF to Western Southern of said sum, Western Southern shall in turn pay said sum to FR, which sum shall be free of any claim held by Western Southern and/or the Buyer. The payment of such sum shall be subject to the provisions concerning `family members' contained in Article II hereof."
 {¶ 12} Section E clearly provided that Western Southern was to enter into a separate agreement with CEF, which was indeed executed in October 1996. The separate agreement between Western Southern and CEF contained language that the remaining $175,000 contemplated by Section E would be funded by a payment to Western Southern by CEF according to the specific terms enumerated. This collateral agreement specified that payment would be triggered by the following:
 {¶ 13} "(i) closing of the contemplated transaction between Western-Southern and the Cincinnati Equity Fund; (ii) a release of any and all claims which the existing owners of the 5th Race Tower may have against the Cincinnati Equity Fund, Downtown Cincinnati, Inc., or any of their shareholders, directors, members, managers, officers, partners, employees, attorneys and accountants; and (iii) the commencement of the Redevelopment of the 5th Race Tower and the adjacent Parkade site, for a use as a department store operated by the Mercantile Stores Company, Inc., or one of its affiliates, or for any other use agreed-uponby the parties [emphasis added]."
 {¶ 14} The third condition became the focal point of this case. Was a parking lot the redevelopment anticipated in the foregoing language? And even if it was so determined to be that redevelopment, was there an agreement between Western Southern and CEF for that use of the property?
 {¶ 15} The only clue to an answer to those questions came from the affidavits of J. Steven Massie, managing director of CEF, and Thomas M. Stapleton, former vice president of Western Southern. Stapleton indicated that the parking lot was required and was constructed by the city to remedy the "below street-grade condition" of the property following demolition of the building. According to both Massie and Stapleton, the use of the property as a parking lot was not an agreed-upon use by Western Southern and CEF. Instead, the parking-lot use occurred without CEF's agreement or participation.
 {¶ 16} Fifth and Race argued that a parking lot constituted redevelopment of the site as contemplated by the collateral agreement. Fifth and Race contended that the city would not have issued building permits for the site to be transformed into a parking lot unless a parking lot was a useful purpose for the site.
 {¶ 17} The trial court determined that the city's issuance of building permits supported Fifth and Race's claim that redevelopment had occurred because, as the court concluded, a parking lot was "an income making enterprise" for the city.[3] The court further concluded that Jeffrey Nelson, the surviving partner of Fifth and Race, had not been "privy to or a part of" either the original agreement between Fifth and Race and Western Southern or the collateral agreement. The court apparently based its decision on the city's issuance of building permits, and it gave little or no weight to the contents of Nelson's deposition.
 {¶ 18} While the trial court did not specifically state that it had disregarded Nelson's deposition, it would appear from the record that certain facts presented therein would have negated the conclusion that the court reached. Nelson's deposition indicated that he had full knowledge of the original agreement between his partnership and Western Southern, and also of the collateral agreement between Western Southern and CEF. While Nelson had not been a signatory to the collateral agreement, he was familiar with its terms and with the need for an agreement between those two parties as to the intended use for the land in question at the time of "redevelopment."
 {¶ 19} After the original redevelopment plans did not materialize, the parking lot was a fallback measure taken by the city. More importantly as it related to the language of the agreement, use of the land for a parking lot was never agreed to by CEF and Western Southern. The fact that building permits had been issued to Western Southern for the grading and paving of the corner did not indicate that an agreement for final development necessary to trigger the final payment obligation had been reached.
 Conclusion {¶ 20} Because redevelopment as contemplated by the parties to the collateral agreement has not commenced, this action seeking enforcement of the collateral agreement is premature, and the trial court erred in granting summary judgment in favor of Nelson. Accordingly, we sustain the assignments of error, reverse the judgment of the trial court, and enter final judgment in favor of Western Southern and CEF.
Judgment accordingly.
Hildebrandt, P.J., and Sundermann, J., concur.
[1] See Doe v. Shaffer, 90 Ohio St.3d 388, 390,2000-Ohio-186, 738 N.E.2d 1243.
[2] See Grafton v. Ohio Edison Co., 77 Ohio St.3d 102, 105,1996-Ohio-336, 671 N.E.2d 241.
[3] We do not address the court's consideration of unauthenticated photocopies of building permits appended to Fifth and Race's motion for summary judgment. The defendants did not dispute that the site had been transformed into a parking lot that may have been income-generating.