[Cite as *Estate of Azbell v. Estate of Guillereault*, 2024-Ohio-5429.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| | | |
|---|---|---|
| ESTATE OF RACHEL AZBELL | | C.A. No.     2024CA0004-M |
| Appellant | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| ESTATE OF SHAWN GUILLEREAULT | | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellee | | CASE No.     19 CIV 1132 |

DECISION AND JOURNAL ENTRY

Dated: November 18, 2024

FLAGG LANZINGER, Judge.

**{¶1}** Plaintiff-Appellant, the Estate of Rachel Azbell ("Azbell's Estate"), appeals from the judgment of the Medina County Court of Common Pleas, granting summary judgment in favor of Intervenor-Appellee, State Farm Fire and Casualty Company ("State Farm"). This Court affirms.

I.

**{¶2}** Shortly before 1:00 a.m., a 911 dispatcher received a call from a McDonald's employee. The dispatcher learned that a naked young woman had run to the restaurant for help. The young woman said her mother's boyfriend had tried to rape her. She also said he had shot her mother, Rachel Azbell. The dispatcher sent units to the home of the boyfriend, Shawn Guillereault.

**{¶3}** Before the police arrived at Mr. Guillereault's home, he called 911. He told the dispatcher he had shot Ms. Azbell during a disagreement. He asked for help and indicated that he was using a compress to keep pressure on her wound. When the police arrived, Mr. Guillereault's

garage door was open. He was standing inside his garage alongside Ms. Azbell, who was seated in a chair with her head tilted back. Mr. Guillereault refused to comply with the officer's directives to raise his hands and lie down on the ground. He repeatedly instructed the officers to shoot him. He then ran back inside the home, and the officers retreated. At that point, the officers believed Ms. Azbell to be dead.

{¶4} Mr. Guillereault had two children. The children called 911 from an upstairs bedroom after the police arrived. The police were able to use a ladder to reach the bedroom window and rescue the children. The police then prepared to enter the house to find Mr. Guillereault. As the SWAT team entered the garage, an officer realized Ms. Azbell was still alive. She was taken to the hospital but later died from her injuries. Mr. Guillereault died from a self-inflicted shotgun wound. The police found his body in the basement of his home.

{¶5} Azbell's Estate filed suit against the Estate of Shawn Guillereault ("Guillereault's Estate") for wrongful death and negligence. The complaint sought compensatory damages, punitive damages, attorney fees, and costs. It specifically alleged that Mr. Guillerault was insured through State Farm.

{¶6} State Farm successfully intervened in the proceedings as a third-party defendant. State Farm admitted it had issued Mr. Guillereault a homeowner's policy as well as an umbrella policy. It argued that coverage was not available under either policy because neither covered intentional and/or criminal acts. State Farm later moved for summary judgment on that basis.

{¶7} Azbell's Estate filed a brief in opposition to summary judgment. State Farm filed a reply. Upon review, the trial court awarded summary judgment to State Farm. The court found that State Farm had no duty to defend or indemnify because coverage was precluded under Mr. Guillereault's policies.

{¶8} Azbell's Estate tried to appeal from the trial court's summary judgment ruling on two occasions. This Court dismissed those appeals for lack of a final, appealable order. *See Estate of Azbell v. Estate of Guillereault*, 9th Dist. Medina No. 22CA0050-M (Aug. 19, 2022); *Estate of Azbell v. Estate of Guillereault*, 9th Dist. Medina No. 2023CA0049-M (July 27, 2023). Following those dismissals, Azbell's Estate and Guillereault's Estate stipulated to a finding of liability and a specific damage award in favor of Azbell's Estate. The trial court entered judgment on the stipulation.

{¶9} Azbell's Estate now appeals from the trial court's summary judgment ruling in favor of State Farm. It raises one assignment of error for review.

II.

ASSIGNMENT OF ERROR

THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING INTERVENOR'S MOTION FOR SUMMARY JUDGMENT.

{¶10} In its sole assignment of error, Azbell's Estate argues the trial court erred when it granted summary judgment to State Farm. We disagree.

{¶11} Under Civ.R. 56(C), summary judgment is appropriate if:

(1) [n]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977). To succeed on a motion for summary judgment, the party moving for summary judgment must first be able to point to evidentiary materials that demonstrate there is no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law. *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). If the movant satisfies this burden, the nonmoving party "must set forth specific facts showing that there is a

genuine issue for trial." *Id.* at 293, quoting Civ.R. 56(E). This Court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996).

**{¶12}** Mr. Guillereault's homeowner's policy provided him with coverage for damage claims brought against him "because of bodily injury or property damage to which this coverage applies, caused by an occurrence . . . ." The policy defined an "occurrence" as "an accident" resulting in bodily injury or property damage. It excluded from coverage any bodily injury or property damage that:

(1) was a result of a:

(a) willful and malicious; or

(b) criminal;

act or omission of the insured;

(2) was intended by the insured; or

(3) would have been expected by the insured based on a reasonable person standard.

Mr. Guillereault's umbrella policy contained similar exclusions.

**{¶13}** The umbrella policy, when applicable, afforded Mr. Guillereault coverage for damage claims brought against him "because of a loss for which [he was] legally liable . . . ." It defined a "loss" as

a. an accident . . . which first results in bodily injury or property damage during the policy period . . . ; or

b. the commission of an offense which first results in personal injury during the policy period . . . .

The policy excluded from coverage any bodily injury or property damage that was

a. either expected or intended by the insured; or

b. the result of any willful and malicious act of the insured . . . .

Thus, neither the homeowner's policy nor the umbrella policy provided coverage for acts that were intentional, expected, or willful and malicious.

{¶14} The trial court found that Mr. Guillereault shot Ms. Azbell in the head at point blank range before he attempted to rape her teenage daughter, A.W. The court found that Mr. Guillereault told A.W. he had shot her mother. A.W. escaped, fled naked from the home, and ran to a nearby restaurant. About 20 minutes after she arrived there, Mr. Guillereault called 911. The court found that he told the dispatcher he had shot Ms. Azbell "during a 'disagreement' that 'got out of control' . . . ." He also told the dispatcher that "he knew that he was 'going to go to jail' for his actions." The court found that, after officers arrived on scene, Mr. Guillereault went inside the house and eventually committed suicide.

{¶15} The trial court found that Mr. Guillereault's insurance policies did not provide coverage for intentional acts, expected injuries, criminal acts, or willful and malicious conduct. The court found that no reasonable juror could conclude the shooting of Ms. Azbell was accidental given Mr. Guillereault's actions and admissions. Rather, the evidence showed her injuries were intended, expected, and the result of a criminal, willful, and malicious act. The court concluded that State Farm was entitled to summary judgment because reasonable minds could only conclude Mr. Guillereault's killing of Ms. Azbell was not an "occurrence" or "loss" under his policies.

{¶16} Azbell's Estate argues that genuine issues of material fact remain as to whether Ms. Azbell sustained bodily injury due to an "occurrence" or "loss" under Mr. Guillereault's policies. Azbell's Estate notes that only Ms. Azbell and Mr. Guillereault were present when Ms. Azbell sustained a gunshot wound, and neither was available to explain what had happened. According to Azbell's Estate, investigators were unable to say how the gun went off or where Ms. Azbell and Mr. Guillereault were located when it did. Azbell's Estate argues that there was evidence the two

had a healthy relationship. Additionally, the evidence showed Mr. Guillereault called for medical aid and attempted to help Ms. Azbell while police and paramedics were responding. Azbell's Estate argues that it produced evidence tending to show the shooting was accidental, and thus, a question of fact remained for the jury. To the extent the court considered the alleged sexual assault of A.W., Azbell's Estate argues, that incident was entirely separate from the shooting and had "absolutely nothing to do with the claims asserted on behalf of [Azbell's Estate]." Azbell's Estate argues the trial court improperly weighed the evidence and usurped the function of the jury when it awarded summary judgment to State Farm.

{¶17} State Farm produced multiple depositions in support of its motion for summary judgment. In her deposition, A.W. testified that she lived with Ms. Azbell, Mr. Guillereault, and his two children. One evening, A.W. went skateboarding while the remainder of the family went bowling. She later fell asleep in her bedroom. She testified that she was awoken by the sound of the garage door opening when her family arrived home. As she continued to rest, she heard several things. She heard the raised voices of Ms. Azbell and Mr. Guillerault. She heard the man door to the garage slamming more than once. She also heard glass breaking. A.W. testified that she fell back asleep despite the interruptions. The next time she woke, she realized Mr. Guillerault was in her bedroom.

{¶18} A.W. testified that Mr. Guillerault attacked her. He told her he was going to rape her, and A.W. struggled. She testified that Mr. Guillereault dragged her to his bedroom. At some point while they were in his bedroom, he commented that Ms. Azbell "keeps pushing and pushing." A.W. understood that comment to mean Mr. Guillereault was frustrated with her mother. When A.W. asked Mr. Guillereault if she could see her mother, he said, "I shot her." A.W. testified that she eventually managed to escape and run to a McDonald's.

{¶19} In her deposition, the 911 dispatcher testified that she received a call from a McDonald's employee at 12:44 a.m. The dispatcher learned A.W. had run to the McDonald's to tell the employees Mr. Guillereault had tried to rape her. The dispatcher advised units in the department that A.W. was being driven to the hospital. She gave the units the address where the attempted rape had occurred. The next 911 call the dispatcher received was from Mr. Guillereault.

{¶20} The parties played Mr. Guillereault's 911 call for the dispatcher, and its contents were transcribed as part of her deposition. During his call, Mr. Guillereault admitted shooting Ms. Azbell in the head. He said he did not know where the gun was and had been looking for it. The following exchange occurred:

> DISPATCHER: What happened? Was it an accident, or?
>
> [MR. GUILLEREAULT]: It was a disagreement and it got out of control and --
>
> DISPATCHER: Disagreement that got out of control?
>
> [MR. GUILLEREAULT]: Yes. She's in rough shape. Please.
>
> . . .
>
> [Mr. GUILLEREAULT]: I don't know about this. She's still fighting. She's still fighting. I'm going to go to jail, though. I did this. I -- I can't be here. Oh, my God. Oh, my God . . . .

Mr. Guillereault informed the dispatcher that he and Ms. Azbell were in the garage. He told the dispatcher that he had opened the garage door and was holding a rag to Ms. Azbell's head wound. The dispatcher advised Mr. Guillereault that he needed to come outside with his hands up to meet the police, but he refused to do so. He repeatedly indicated that he needed to hold pressure on Ms. Azbell's wound. When the police arrived, the 911 recording captured exchanges between Mr. Guillereault and the officers on scene. In response to repeated commands to get on the ground, Mr. Guillereault told the officers at least nine times to shoot him.

{¶21} In his deposition, Sergeant Christopher LaFond testified that he arrived at Mr. Guillereault's home around 1:04 a.m. in response to his 911 call. He and other officers found Ms. Azbell and Mr. Guillereault in the garage. Ms. Azbell was seated in a folding chair near the back of the garage with her head tipped back. Mr. Guillereault stood to her side holding a rag to her head. Sergeant LaFond testified that Mr. Guillereault repeatedly instructed officers to shoot him before running inside in the home. When the police later searched the home, Sergeant LaFond testified, they found the 9mm handgun that had caused Ms. Azbell's injury on the floor next to the bed in A.W.'s bedroom. Sergeant LaFond observed clothing and items strewn about the room and items trapped beneath the bed frame. Based on his observations, he concluded that a struggle had ensued in the room.

{¶22} In his deposition, Edward Staley testified that he worked for the Bureau of Criminal Investigation and helped process the scene at Mr. Guillereault's house. He testified that he found one spent casing at the base of the steps on the garage floor. He also found broken glass on the garage floor. Mr. Staley testified that he was unable to conduct any kind of shooting reconstruction. He explained that there were no bullet holes in the garage that would have allowed him to calculate trajectory.

{¶23} In her deposition, Summit County Medical Examiner Dr. Lisa Kohler testified that she conducted Ms. Azbell's autopsy. She located a single gunshot wound to Ms. Azbell's head. Although Dr. Kohler could not say how Ms. Azbell or Mr. Guillereault had been positioned when Ms. Azbell was shot, she testified that Mr. Azbell was shot from the front such that the bullet was coming toward her face. She testified that the bullet wound was a near/loose contact wound, meaning the gun was fired "very close to [her] skin." She estimated the gun was "around an inch or so" away from Ms. Azbell when fired.

{¶24}   In his deposition, Deputy Medical Examiner Dr. David Dolinak testified that he conducted Mr. Guillereault's autopsy.  He testified that Mr. Guillereault died as the result of a gunshot wound to the head.  At the time of his death, Mr. Guillereault tested positive for marijuana and had a blood alcohol intoxication level of .151.  Evidence showed that he died alongside a second gun, which was a rifle.  The police also found three other guns in the house: a second rifle in the basement, a shotgun on the first floor, and the 9mm handgun upstairs.

{¶25}   Upon review, the record supports the conclusion that State Farm satisfied its initial burden on summary judgment.  *See Dresher*, 75 Ohio St.3d at 292-293.  It set forth evidence that Mr. Guillereault intentionally shot Ms. Azbell in the head; an act that would preclude coverage under both of his policies.  Accordingly, it became the reciprocal burden of Azbell's Estate to set forth evidence of a genuine issue of material fact for trial.  *See id.* at 293.

{¶26}   Azbell's Estate produced an affidavit from R.A., another daughter of Ms. Azbell's.  R.A. averred that she regularly spoke with her mother and never witnessed Mr. Guillereault harm her mother.  She averred that her mother had no intention of leaving Mr. Guillereault and the two had future trips planned.  Azbell's Estate used R.A.'s affidavit to incorporate by reference various printouts from Ms. Azbell's social media accounts.  The printouts showed Ms. Azbell had posted positive messages about her relationship with Mr. Guillereault.

{¶27}   Azbell's Estate also presented other evidence regarding Ms. Azbell and Mr. Guillereault's relationship.  In her deposition, Detective Angela Vivo testified that the police examined Ms. Azbell's cell phone records after the shooting.  She agreed that Ms. Azbell's text messages appeared to show she had a healthy relationship with Mr. Guillereault.  Further, Detective Vivo agreed that Mr. Guillereault's neighbors had reported that he and Ms. Azbell appeared to have a positive relationship.

{¶28} Azbell's Estate produced an expert report and affidavit from Mark Meredith, a former police officer and expert in police practices and procedures. Mr. Meredith concluded that the police failed to conduct sufficient forensic testing and comply with accepted police practices regarding the handling and processing of evidence in this case. He noted that the police had not collected prints from the guns found at the scene, had not conducted any type of blood spatter analysis, and had not tested for gunshot residue or blood evidence on the clothing of Mr. Guillereault or Ms. Azbell. He concluded that the ruling of murder-suicide by the police department and the Bureau of Criminal Investigation could not be accepted due to the incomplete investigation.

{¶29} Azbell's Estate argues that the positive relationship between Ms. Azbell and Mr. Guillereault tended to show the shooting that occurred was accidental. It argues that, had Mr. Guillereault intended to shoot Ms. Azbell, he would not have called 911 for help or attempted to stop her head from bleeding. It notes that Ms. Azbell was shot a single time, but the police recovered multiple guns from the house, including the shotgun Mr. Guillereault used to commit suicide. Had he wanted to kill Ms. Azbell, the estate argues, he would have shot her multiple times or used a shotgun. The estate notes that Mr. Guillereault was intoxicated at the time of his death. It argues that it is reasonable to infer he may have fallen while holding the gun such that it accidentally discharged and struck Ms. Azbell. Because no one could definitively say what happened in the garage and the trial court was obligated to construe the evidence in its favor, Azbell's Estate argues the trial court erred when it entered summary judgment in favor of State Farm.

{¶30} Upon review, we cannot conclude Azbell's Estate satisfied its reciprocal burden and set forth evidence of a genuine issue of material fact for trial. *See Dresher*, 75 Ohio St.3d at

293. Mr. Guillereault admitted he shot Ms. Azbell during a disagreement that "got out of control." The evidence showed that he fired a gun at her head, facing toward her, from one to two inches away. His admission, coupled with the position of the gun, made an accidental shooting implausible. *See W. Res. Mut. Ins. Co. v. Campbell*, 111 Ohio App.3d 537, 542-543 (9th Dist. 1996). Moreover, after the shooting, Mr. Guillereault attempted to rape Ms. Azbell's daughter. He told A.W. he had shot her mother and her mother "[kept] pushing and pushing." The police found signs of a struggle in A.W.'s bedroom as well as the 9mm handgun. Even if the relationship between Ms. Azbell and Mr. Guillereault appeared positive to others, evidence of that fact did not create a genuine issue of material fact for trial. Likewise, evidence that Mr. Guillereault eventually became remorseful and attempted to aid Ms. Azbell did not create a triable issue. Viewing the evidence in a light most favorable to Azbell's Estate, reasonable minds could only conclude that Mr. Guillereault intended to shoot Ms. Azbell and expected her to be injured. His actions did not constitute an "occurrence" or "loss" under his policies. Accordingly, the trial court correctly awarded summary judgment to State Farm. Azbell's Estate's sole assignment of error is overruled.

III.

{¶31} Azbell's Estate's assignment of error is overruled. The judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JILL FLAGG LANZINGER
FOR THE COURT

STEVENSON, P. J.
CARR, J.
CONCUR.

APPEARANCES:

RUSSELL A. RANDAZZO, Attorney at Law, for Appellant.

THOMAS M. COUGHLIN, JR., Attorney at Law, for Defendant.

EVAN J. PALIK, Attorney at Law, for Intervenor-Appellee.